# Deposition Transcript

Case Number: 24 Cr. 227 (ER)
Date: April 8, 2026

In the matter of:

# UNITED STATES OF AMERICA v DANIEL SIKKEMA

# DAILYN HIDALGO HERNANDEZ



CERTIFIED COPY

Reported by:
Rachel McRoy

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 24 Cr. 227 (ER)

UNITED STATE OF AMERICA,

   Plaintiff,

V.

DANIEL SIKKEMA,

   Defendant.
_____/

REMOTE CONFERENCE

DEPOSITION OF DAILYN HIDALGO HERNANDEZ

Taken at:
Fiscalia Provincial de Castello
Cuidad de la Justicia
Bulevar Vicente Blasco Ibanez
10.3a Planta. 12003
Castellon de la Plana, Spain

Taken on behalf of Plaintiff

\* \* \*

April 8, 2026

Rachel McRoy, RPR

Court Reporter

APPEARANCES:

For the Plaintiff:

ALEXANDER LI, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF NEW YORK
One Saint Andrews Plaza
New York, New York 10007
(212)637-2265
Alexander.li@usdoj.gov


For the Defendant:

RICHARD W. LEVITT  ESQUIRE
FLORIAN MIEDEL, ESQUIRE
LEVITT & KAIZER
40 Fulton Street
17th Floor
New York, New York 10038
(212)460-4000
Rlevitt@landklaw.com


ALSO PRESENT:

Lucia Bachero Sanchez, Fiscalia Provincial de
Castellon
Philip Hill, Videographer
Mercedes Avalos, Interpreter
Sharmila Dey, Check Interpreter
Amanda Meyer, Federal Bureau of Investigation
William Bolinder, Federal Bureau of Investigation

```
                              INDEX

  Examination by:                                      Page

  Mr. Li                                                  9
  Mr. Levitt                                             64
  Mr. Li                                                 86


                             EXHIBITS


  Exhibit                 Description                   Page

  Exhibit 5                Photograph                     10

  Exhibit 712             WhatsApp Messages               64

  Exhibit 851A-T          WhatsApp Audio Transcript       21

  Exhibit 851/851-T  WhatsApp Messages                    16

  Exhibit 853/853-T  WhatsApp Messages                    25

  Exhibit 855/855-T  WhatsApp Messages                    26

  Exhibit 857/857-T  WhatsApp Messages                    35

  Exhibit 858-A      Audio File                           21

  Exhibit 864/864-T  WhatsApp Messages                    38

  Exhibit 867/867-T  WhatsApp Messages                    40

  Exhibit 871/871-T  WhatsApp Messages                    45

  Exhibit 873/873-T  WhatsApp Messages                    51

  Exhibit 874/874-T  WhatsApp Messages                    56

  Exhibit 875/875-T  WhatsApp Messages                    61


            (Exhibits retained by counsel)
```

THE VIDEOGRAPHER:  Good morning.  We are now going on the record.  The time is 10:00 a.m. local time in the town of Castellon de la Plana in Spain, on today's date, April 8th, 2026.  We are here to take the video deposition of Dailyn Hidalgo Hernandez.  This is taking place in the Fiscalía Provincial de Castellon, a local court in the town of Castellon de la Plana that -- excuse me -- in the matter of the United States of America versus Daniel Sikkema.

Please, will all parties introduce themselves for the record?

MR. LEVITT:  Good morning.  My name is Richard Levitt, along with my co-counsel, Florian Miedel.  We represent Daniel Sikkema.

MR. LI:  Good morning.  My name is Alexander Li.  I'm an Assistant United States Attorney in the Southern District of New York.  I represent the United States of America in this matter.

MS. SANCHEZ:  I am Lucia Bachero Sanchez.  I'm an International Cooperation Prosecutor in Castellon, and based on the request by the Passive Commission 726 in the Ministry of Justice, and the requestor was the United States.

THE VIDEOGRAPHER:  The videographer would just like to note that this case is being heard in the

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

United States District Court, Southern District of New York, Case Number 24CR227[ER][SDNY].

Now, please, will the -- firstly, the interpreters be sworn in, and then afterwards, please can the witness be sworn in.

THE REPORTER:  Do you swear or affirm to translate from English to Spanish and from Spanish to English to the best of your ability?

THE INTERPRETER:  I do.  Mercedes Avalos, A-v-a-l-o-s, AOUSC federally certified Spanish Interpreter, the interpreter of record.

THE REPORTER:  Do you hereby acknowledge that your testimony will be true under the penalty of perjury?

CASTILLON DE LA PLANA, SPAIN; WEDNESDAY,

April 8, 2026

10:03 a.m.

* * *

DAILYN HIDALGO HERNANDEZ, called as a witness on behalf of the Plaintiff, having first been sworn by the Reporter, testifies as follows:

MS. DEY:  Good morning.  I am the translator from the Spanish International Prosecutor's side here to present the whole thing.  And my name is Sharmila Dey.

MR. LI:  And I believe the Spanish

prosecutor also intended to administer an oath according to local proceedings?

MS. SANCHEZ:  No.  Just to state on the record that we have received a passive request from the United States, and that we have seen Dailyn Hidalgo Hernandez as a witness appearing herein as a witness and that she is required to state the truth.  And if she were to make any misleading or untrue statement, she would possibly be committing the crime of false testimony.  Can I understand that she has sworn to tell the truth; is that so?

THE WITNESS:  Yes.

MS. SANCHEZ:  We can start with the deposition.

THE VIDEOGRAPHER:  Today's court reporter is Rachel McRoy, and the videographer is Phillip Hill representing Steno Court Reporting Service.  Thank you very much.

MR. LI:  And just an abundance of caution, would the videographer please state the business address of record?  Your business address or Steno's business address.

THE VIDEOGRAPHER:  Excuse me, sir. Just -- I think the Steno office is the East Coast location.

Excuse me, sir.  I can't seem to find the actual address at this time.

MR. LI:  It's no problem.  I believe the address is 315 West Ninth Street in Los Angeles, California, in the United States of America.

And also I'll just note, in addition to the individuals who will be conducting the deposition, there are also two special agents of the FBI present, Amanda Meyer and William Bolinder, as well as certain employees of the Fiscal Provincial de Castellon.

Okay.  We'll get started.  So I believe the defense wanted to place on the record certain objections.

MR. LEVITT:  Yes.  Thank you.  Before we begin, we want to place on the record a continuing objection to the admission of any text messages, chats, or other out-of-court communications between this witness and Alejandro Preves and to related testimony recounting the contents of those communications or related phone calls on the grounds of hearsay and hearsay within hearsay under Rule 805 of the Federal Rules of Evidence, as well as a lack of foundation, such as anticipated testimony that the witness spoke with someone who she believed was Daniel Sikkema, and any other applicable evidentiary objection.

To avoid unnecessarily interruption, we ask this to be treated as a standing objection to the subject matter and to the related exhibits with the understanding that we may supplement or particularize objections if a specific question, exhibit, or proffer raises additional grounds such as relevance or 403 concerns, for example. Also, because I anticipate that the government will elicit testimony that we will argue is inadmissible hearsay, on cross-examination we will need to also ask questions that will call for hearsay answers.

I want to make clear that we will be doing so since we of course can't get contemporaneous rulings on objections during the deposition and my questions, therefore, should not be construed as opening any doors or conceding the admissibility of hearsay. To the extent the government wants to address any of those issues now reserving both of our rights to further express our views later, I'm happy to do that. Otherwise, we'll just put our additional objections on the record during the witness's testimony. Thank you.

MR. LI: Thank you. And just for clarity of the record, even though there is not a judge here today, that the lawyers are required to state their objections so that the judge can later review them. And so for the

witness's benefit, the witness, you may hear lawyers say "objection" from time to time, and you don't need to worry about that.  Regardless of whether a lawyer objects, the witness should answer the question if the witness understands the question.

MR. LEVITT:  May I note on the record also that Mr. Sikkema is able to observe and hear these proceedings via a video link.

MR. LI:  And with respect to the objections, understanding all parties have reserved their rights, the government's view is that all objections and the basis for them should be stated contemporaneously on the record pursuant to Federal Rule of Criminal Procedure 15.  Okay.  Let's get started.

EXAMINATION

BY MR. LI:

Q.  Would you please state your name?

A.  Dailyn Hidalgo Hernandez.

Q.  And what country were you born?

A.  Cuba.

Q.  Did you grow up there?

A.  Yes.

Q.  In what country do you currently live?

A.  Spain.

Q.  When did you move to Spain?

A.  In 2024.

Q.  And there is a binder in front of you with exhibits that I expect to show you at this deposition today.  I'm also going to project the exhibits onto the screen so everyone in the room can see them.  Can I ask that you open your exhibit binder to Government Exhibit 5, please?

(Exhibit No. 5 was marked for identification.)

BY MR. LI:

Q.  Do you recognize the person shown in Government's Exhibit 5?

A.  Yes.

Q.  Who is that?

A.  Alejandro Triana Preves.

Q.  How do you know Alejandro?

A.  I met him in 2020 through a WhatsApp group.

Q.  What is WhatsApp?

A.  It is an application.  A social media chat.

Q.  Is that an application that you access on your cell phone?

A.  Yes.

Q.  What was the nature of your relationship with Alejandro?

A.  A friendship.

Q.  Did you ever get the sense that Alejandro wanted

DAILYN HIDALGO HERNANDEZ                                          JOB NO. 2563037
APRIL 08, 2026

a different kind of relationship?

A.   Yes.

Q.   And what kind?

A.   Something beyond a friendship.

Q.   When was the last time that you communicated with Alejandro over WhatsApp?

A.   It was around 2024, around the time when I received a call from an attorney letting me know that he was in jail.

Q.   I want to focus now on the time period of approximately August 2023 through early 2024.  During that time period, did you receive any money from Alejandro either directly or indirectly?

A.   Yes.

Q.   How many times did you receive money from Alejandro?

A.   Two times.

Q.   And approximately when?

A.   I do not remember the exact dates.

Q.   Approximately how much money did you receive on each of those two occasions?

A.   The first time 300, and the second time 5000.

Q.   How did Alejandro get you the money?

A.   Through a family member, a friend --

THE INTERPRETER:  Interpreter correction.

THE WITNESS:  Through the family member of a friend.

BY MR. LI:

Q.  Do you know the names of any of those individuals?

A.  His friends, yes.

Q.  And what was that name?

A.  Daniel.

Q.  Do you know whether Daniel's -- excuse me.  Let me rephrase.

Do you know any other names for Daniel?

MR. LEVITT:  I object.  Basis of knowledge.

BY MR. LI:

Q.  You can continue.

A.  Daniel Garcia.

Q.  Do you know whether that's his full name?

MR. LEVITT:  Same objection.

THE WITNESS:  I don't know.

BY MR. LI:

Q.  Have you met Daniel in person?

A.  No.

Q.  Have you ever spoken with him over the phone?

A.  Yes.

Q.  Approximately how many times do you recall speaking with Daniel over the phone?

A.   Once or twice.

Q.   So in your binder is a series of exhibits that are marked for identification as Government Exhibits 851 through 875, and those are the WhatsApp exhibits.

Would you mind just flipping through those?

A.   What was the number again?

Q.   851 through 875.

A.   So I should review them all?

Q.   You don't need to review them closely.  But just flip through them to see if they're familiar to you.

Apologies.

A.   To what number did you say?

Q.   875.

MS. SANCHEZ:  And what if there are questions regarding the exhibits that are being shown to the witness?

MR. LI:  We'll have an opportunity to discuss those.

THE WITNESS:  Okay.

BY MR. LI:

Q.   All right.  Do you recognize the exhibits you just reviewed, that is Government Exhibits 851 through 875?

A.   Yes.

Q.   Are they some of your WhatsApp messages with

Alejandro Triana Prevez between August 2023 and January 2024?

A.  Yes.

Q.  Do they include electronic attachments to those WhatsApp messages such as voice notes and photos?

A.  Yes.

Q.  Have you reviewed Government Exhibits 851 through 875 and their attachments in preparing for your testimony today?

A.  Yes, just now.

Q.  So far as you can tell, are they true and accurate excerpts of some of your WhatsApp messages with Alejandro?

A.  Yes.

Q.  I'm now going to ask you questions about some of the words and phrases used in your WhatsApp messages and other communications with Alejandro.  Before I do, are the WhatsApp messages you just reviewed, that is Government Exhibits 851 through 875, all of your messages with Alejandro or only some of them?

A.  Just some.

Q.  In addition to your WhatsApp messages, did you also have calls with Alejandro?

A.  Yes.

Q.  Did you meet with him in person?

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

A.   When in Cuba, yes.

Q.   Between around 2020 when you first met in the WhatsApp group chat and January of 2024, how often did you and Alejandro communicate?

A.   A lot on WhatsApp.

Q.   Did those WhatsApp messages, calls, and in-person meetings with Alejandro help you understand what he was saying to you?

A.   Regarding what?  I mean, at the time, I don't understand.

Q.   Sure.  Let me ask a better question.  When you were reading messages that Alejandro would send you, did your understanding any of those messages -- was your understanding of those messages informed by your other communications with him?

A.   I still don't understand the question.

Q.   So when he would send you messages, would he sometimes refer to another conversation that you had with him?

A.   Yeah.  The thing is that I'm not understanding what you're trying to --

Q.   Let me try again.  Were there times, for example, when he referred to traveling to Spain?

A.   Oh, yes.

Q.   And when he talked about traveling to Spain, was

he referring to other conversations you had with him about going to Spain?

A. I don't quite understand.

Q. Okay. I'll move on.

In what language did you communicate with Alejandro?

A. Spanish.

Q. I'm now going to show you versions of those WhatsApp messages, that is Government Exhibits 851 through 875 that have both the original Spanish and English translations. These translated copies are marked for identification as Government Exhibits 851-T through 875-T.

MR. LEVITT: I want to impose -- interpose an objection. These exhibits all include hearsay and hearsay within hearsay. Anything that Alejandro says is hearsay if offered for the truth of the matter asserted and sometimes he refers to things that other people have said, and that's hearsay within hearsay without appropriate exceptions under Rule 805. And certain of them as well are irrelevant or otherwise excludable under Rule 403.

(Exhibit No. 851 and 851-T was marked for identification.)

BY MR. LI:

Q.   Okay.  So let's get started with Government
Exhibit 851-T, and can you turn to that in your binder.
I've also placed a copy on -- electronically on the
screen.  So at the top of the exhibit, there are two
participants listed.  Who is Goldi?

A.   That's me.

Q.   Who came up with that name?

A.   Him, Alejandro.

Q.   Above Goldi, there's a long number that reads
535-353-9218.  Do you recognize that number?

A.   Yes, that's mine.

Q.   When you say it's yours, do you mean that was
your phone number?

A.   Yes.

Q.   The second participant listed is Ale.  Who is
that?

A.   Alejandro.

Q.   Do the same two participants appear on all of the
WhatsApp chat messages you reviewed earlier, that is
Government Exhibit 851 through 875?

A.   Yes.

Q.   So looking here at Page 1, there are chat
messages in green on the right of the page.  Who sent
those chat messages in green?

A.   Alejandro.

Q.   And if you turn to Page 2, you'll see a chat message in blue on the left.  Who sent the message in blue to the left?

A.   I did.

Q.   Across all of the WhatsApp messages you reviewed a moment ago, that is Government Exhibits 851 through 875, do your messages always appear in blue to the left?

A.   Yes.

Q.   And across all of those WhatsApp message exhibits, do Alejandro's messages always appear in green to the right?

A.   Yes.

Q.   So let's turn back to the first page, please.  In the first message, which is dated August 21st, 2023, at approximately 2:48 p.m. UTC, Alejandro writes, "This weekend, I have to go to Rio.  Everything is ready for that."

          MR. LEVITT:  Objection.  I repeat the hearsay objections previously made.

BY MR. LI:

Q.   What do you understand Rio to mean?

A.   It is an area in Brazil.

Q.   At that time, in what country were you living?

A.   Cuba.

Q.  At that time, in what country was Alejandro living?

A.  Brazil.

Q.  When did he move to Brazil?

A.  In 2021.

Q.  Do you know where he was living in Brazil at that time?

MR. LEVITT:  Objection.  Basis for knowledge.

THE WITNESS:  No.

BY MR. LI:

Q.  In the next message, Alejandro says, "The day when I will have more and start investing is approaching."

MR. LEVITT:  May I have a continuing objection rather than objecting to every question.  It might be easier for everybody, but I'll be guided by the government on this.

MR. LI:  I think, unfortunately, the rule requires an objection to each, but I'm certainly comfortable if you want to refer back to your earlier objection.

MR. LEVITT:  Same objections.

BY MR. LI:

Q.  What do you understand Alejandro to mean when he

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

says "start investing"?

MR. LEVITT:  Objection.  Basis for knowledge.

THE WITNESS:  He wanted to make money in order to purchase houses and get them to work.

BY MR. LI:

Q.  At around this time, did he tell you how he was going to make money?

A.  No.  I just knew that he was going to do some sort of excursion and some other jobs that he was doing.

Q.  And how did you know that was his plan?

MR. LEVITT:  Objection.  Hearsay.

THE WITNESS:  That's what he used to tell me.  I don't really know.

BY MR. LI:

Q.  And did he tell you that around the time that he sent you these messages?

A.  Yes.

Q.  Did he explain to you what kind of excursion work he was doing?

A.  Like as a tour guide.

Q.  And a tour guide where?

A.  In some region of Brazil.  I assume it is the area of Rio, which -- the one that we just mentioned.

MR. LEVITT:  Objection.  Hearsay.

Assumptions.

BY MR. LI:

Q.   Did Alejandro tell you who he was going to be showing on these tours?

THE INTERPRETER:   For the interpreter, may the question be repeated?

BY MR. LI:

Q.   Sure.   Did Alejandro tell you who his clients were for these tours?

A.   No.

Q.   Let's turn to Page 2 in the exhibits in front of you.   The next message is an audio file sent by Alejandro at approximately 2:48 p.m.   That audio file is marked as Government Exhibit 858-A.

(Exhibit 858 and 858-A was marked for identification.)

BY MR. LI:

Q.   At this time, I'm going to ask that you turn in your binder to Government Exhibit 851A-T.   And that's the corresponding transcript and translation of the audio file.   I'm going to now play the audio recording.

(Exhibit No. 851A-T was marked for identification.)

[Audio playing.]

BY MR. LI:

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

Q.   Do you recognize the speaker's voice in the audio file we just heard?

A.   Yes.

Q.   Who's voice do you recognize?

A.   Alejandro's.

Q.   Let me direct your attention to the first --

MR. LEVITT:  May I just interpose?  I'm sorry.  Interpose the objection with regard to these exhibits, including the one that we're presently addressing.  The witness is testifying about chats and recordings that are not even in evidence.

MR. LI:  Sure.  I'll just note that because we're doing a deposition, no exhibits will be offered at this time.  Any exhibits that may be offered at the trial will be offered and admitted at a later time.

BY MR. LI:

Q.   So with respect to Page 1, please, let me direct your attention to Lines 3 through 7.  There Alejandro says, "I'm going to take it and when they pay me the money they own me for the tour and all that, which is quite a lot, right?"

What did you understanding Alejandro to be referring to when he said "the tour"?

A.   The excursion.

Q.   And is that the excursions in Brazil that you

described earlier?

A.  Yes.

Q.  Who did you understand Alejandro to be referring to when he said "when they pay me the money they owe me"?

MR. LEVITT:  Objection.  Basis of knowledge.

THE WITNESS:  He was referring to the person or the persons for whom he would be doing the excursion.

BY MR. LI:

Q.  And do you know who those person or persons are?

MR. LEVITT:  Same objection.

THE WITNESS:  No.

BY MR. LI:

Q.  Did Alejandro tell you where in Rio he would be doing these tours?

MR. LEVITT:  Objection.  Calls for hearsay.

THE WITNESS:  No.

BY MR. LI:

Q.  Let's take a look at the next sentence which begins on Line 7 of Page 1.  There Alejandro says, "Let's say it's an amount of money I've never seen in my life.  I have never seen 15,000 all at once or even 10,000 but any way."  What money did you understand Alejandro to be referring to?

MR. LEVITT:  Same objections.

THE WITNESS:  The money from the excursion.

BY MR. LI:

Q.  Let's turn back to Government Exhibit 851-T, and that's the WhatsApp messages.  So if you turn to Page 2, please.  In the last message, which is dated August 21st, 2023, at approximately 2:51 p.m. UTC, Alejandro responds to a message you wrote him.  And in response to your message which reads "I'm happy that you're progressing.  You can do it."  Alejandro writes, "I told you I was going to do it just before I left from there, and I will continue to do so until the day I have the house of your dreams in my possession, where you want to be, and where you and your family are safe."

What did you understand Alejandro to be referring to when he wrote "the house of your dreams"?

MR. LEVITT:  Objection.

THE WITNESS:  Well, he knew that I had always wanted to come to Spain, so he kept telling me that he was going to buy me a house here as though it were that easy, but, oh, well.  But yeah, he would always tell me that.

BY MR. LI:

Q.  And when you say he would always tell you that, are you referring to other communications you had with him?

A.   Yes.

Q.   And so when you read a phrase like "the house of your dreams" in this message, is your understanding of that phrase based in part on these other communications that you had with Alejandro?

MR. LEVITT:  Objection.  Leading.

THE WITNESS:  Yeah.  I used to always tell him that I wanted to come to Spain, that I had some sort of relationship and familiarity with certain areas of Spain here.  And so whenever I'd say that to him, he'd say to me that he wanted to help me and buy me the house of my dreams and things of the sort.

BY MR. LI:

Q.   All right.  Let's turn to Government Exhibit 853-T.  So we have here four messages from Alejandro to you, and the first one starts on August 25th, 2023, at approximately 9:10 p.m. UTC.  I'll just read the four messages.

MR. LEVITT:  Same objections.

(Exhibit No. 853 and 853-T was marked for identification.)

BY MR. LI:

Q.   "I'm on my way to Rio.  I'm almost at the bus station, but I'm not there yet.  Now let's get to the hard part.  I'm here."

What location did you understand Alejandro to be referring to when he wrote in the last message "I'm here"?

MR. LEVITT:  Objection.  Relevance based on what she thought.  Basis for knowledge.

THE WITNESS:  Rio, which is where he was mentioning.

BY MR. LI:

Q.  And if you turn back one page, in the last message, Alejandro refers to "the hard part."  Do you have an understanding of what he was referring by "the hard part"?

MR. LEVITT:  Objection.  Hearsay.  Basis and knowledge.

THE WITNESS:  Well, no, the excursion.

(Exhibit No. 855 and 855-T was marked for identification.)

BY MR. LI:

Q.  All right.  Let's turn to Government Exhibit 855-T, please.  So what I'd like to do here is for us both to read the messages.  And you can read the messages in blue to the left, and I'll read Alejandro's messages in green to the right.  And let's start with your message at the very top which is dated August 30th, 2023, at approximately 3:40 p.m. UTC.

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

                    MR. LEVITT:  Same objections.

                    THE WITNESS:  "A lady called me on behalf of
Daniel Garcia.  Could it be about 300 USD?"
BY MR. LI:
    Q.  "Yup.  She already gave it to you?"  Gave.  Let's
pause there.
    A.  Okay.
    Q.  What is the $300 that you're referring to in
these messages?
    A.  Some money that he wanted to send to me.
    Q.  When you say he wanted to send to you, who are
you referring to?
    A.  Alejandro.
    Q.  Do you have an understanding of why he wanted to
send you this money?
    A.  Well, I was out of work, and I wanted to start my
own nail salon as my own business, and so he wanted me
to use that money to pay taxes and whatever else I
needed.
    Q.  What did you understand Alejandro to be referring
to when he said "she already gave it to you"?
                    MR. LEVITT:  Objection.  Relevance.
Hearsay.
                    THE WITNESS:  Had they already been
delivered to me.

DAILYN HIDALGO HERNANDEZ                          JOB NO. 2563037
APRIL 08, 2026

BY MR. LI:

Q. Delivered what?

A. The money.

Q. And he refers here to "she." Who's she?

A. A family member of his friend.

Q. And when you say "his friend," who are you referring to?

A. The person through whom the money was going to be sent to me, whom I had been -- who I had been told was Daniel.

Q. Who told you the name Daniel?

MR. LEVITT: Objection. Same objections.

THE WITNESS: The family member that called me.

BY MR. LI:

Q. Do you have an understanding of the relationship between that family member and Daniel?

MR. LEVITT: Objection. Basis and knowledge.

THE WITNESS: She was -- she told me she was his cousin.

BY MR. LI:

Q. So just for convenience, I'm going to refer to her as the cousin.

Did you have a conversation with the cousin?

A.   To get directions for me to get there.

Q.   And did this conversation occur by text message, by voice, or some other means?

A.   She called me.

Q.   Were you expecting her call?

A.   No.

Q.   During that call, did she identify this person you described as Daniel?

A.   Can you please repeat that?

Q.   Sure.  Let me try to ask a different and maybe better question.

In your second message, at the beginning of Government Exhibit 855-T, you refer to someone called Daniel Garcia.  Where did that name, Daniel Garcia, come from?

MR. LEVITT:  Objection.  Hearsay and basis of knowledge.

THE WITNESS:  The cousin gave it to me.

BY MR. LI:

Q.   And did she do that on the phone call that you were describing a moment ago?

A.   Yes.

Q.   What else, if anything, do you recall from that conversation you had with the cousin?

A.   Just the address where the money was supposed to

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

be picked up.

Q.   Did she describe on the call why she was calling you?

A.   To deliver the money to me.

Q.   Did she explain on who's behalf she was giving you the money?

A.   Yes.

MR. LEVITT:  Objection.  Hearsay.

BY MR. LI:

Q.   And on who's behalf?

A.   Alejandro.

Q.   Anyone else?

A.   No.

Q.   Well, you said earlier that she brought up Daniel Garcia.  Did she explain why she brought up Daniel Garcia in the phone call with you?

A.   Well, that was to identify through whom the money was coming, but the money was coming on behalf of Alejandro.

MR. LEVITT:  Same objections.

BY MR. LI:

Q.   So just to make sure I understand you correctly, the cousin explained on the phone call to you that she was going to give you $300 that was sent by Alejandro through Daniel Garcia, did I get that right?

A.  Yes, that's right.  It's as though, let's say right now I want to send some money to a family member of mine and I just don't know how to send it, then I would send it through a friend of mine.  So something like that.

Q.  And just to make sure I understood you correctly, on this phone call, the cousin also stated that she was the cousin of Daniel Garcia?

MR. LEVITT:  Same objections.

THE WITNESS:  Yes.

BY MR. LI:

Q.  All right.  Let's continue where we left off. Could you please start reading from the bottom of Page 2.  And that's your message of approximately 3:40 p.m.  "Yes, yes, everything is confirmed."  I'm sorry.

A.  She called me to give it to me in cash just confirming because she said Daniel and -- I don't know. It's the cousin.

Q.  "Yes.  Yes.  Everything is confirmed."  All right.  Let's pause there.  Who were you referring to when you wrote "it's the cousin"?

MR. LEVITT:  I want to make sure -- objection.  I want to make sure that our objections extend to the out-of-court statements of this

witness as well.

BY MR. LI:

Q. You can continue.

So the question was, who were you referring to when you wrote "it's the cousin"?

A. Daniel's.

Q. What were you referring to when you wrote, "He's confirming because she said Daniel and I don't know"?

A. Yeah. That she was confirming that she would be giving me the -- that amount of money and where it should be picked up.

Q. And when you say "she," are you referring there to the cousin?

A. Yes.

Q. What did you understand Alejandro to be telling you when he responded "yes, yes, everything is confirmed"?

A. That he sent that money.

Q. At the bottom of this page at 3:41 p.m. you wrote, "I would have to send Chao to go for it because I can't get out right now. My grandfather's car is broken." Who is Chao?

A. My husband's last name.

Q. What were you talking about Chao getting?

A. The money.

DAILYN HIDALGO HERNANDEZ                                  JOB NO. 2563037
APRIL 08, 2026

Q.  Let's turn to Page 4, please.  So at the center of the page at approximately 3:41 p.m., Alejandro responds to one of your messages.  In response to your message which says, "He's confirming because she said Daniel and I don't know."  Daniel wrote, "Of course because I gave it to Daniel and it's already been paid for."

MR. LEVITT:  Objection to hearsay.

BY MR. LI:

Q.  What did you understand Alejandro to be telling you in his response?

A.  That -- yes.  That because the cousin had given me the name Daniel, so he is confirming to me that he had given Daniel the money so that he would have it sent to me.

Q.  And when you say "he had given the money to Daniel," are you referring by "he" to Alejandro?

A.  Yes.

Q.  In the next message Alejandro wrote, "He's a contact so the woman doesn't even know me."  What did you understand Alejandro to be telling you here?

MR. LEVITT:  Objection.  To what she understands.

THE WITNESS:  That he did not know the person --

THE INTERPRETER:  Interpreter correction.

THE WITNESS:  That he was not familiar with the person that was going to be delivering the money to me in Cuba.

BY MR. LI:

Q.  Let's turn to Page 5, please.  At the top of the page at approximately 4:32 p.m. you write, "She went to write her cousin now."  Who are you referring to by she?

A.  The girl that called me.

Q.  And who were you referring to by "her cousin"?

A.  Well, the person that called me identified herself as being Daniel's cousin, so it's the same thing when she tells me she is calling her cousin.

Q.  So in other words her cousin in this sentence is Daniel?

A.  Yes.

Q.  Do you know why she went to write Daniel?

MR. LEVITT:  Objection.  Speculation.

THE WITNESS:  No.

BY MR. LI:

Q.  All right.  Let's turn to Government Exhibit 857-T.  And since we're about an hour, and let me ask the witness, would you like to take a break?

A.  No.

(Exhibit No. 857 and 857-T was marked for

identification.)

BY MR. LI:

Q.   Okay.   Then we'll continue.   So at the beginning of this excerpt, Alejandro sends you two messages starting on August 30th, 2023, at about 4:58 UTC.   The messages read, "Did they give you the address where to pick it up, the money?"   What money did you understand Alejandro to be referring to?

MR. LEVITT:   Repeating previous objections applying to this exhibit as well.

THE WITNESS:   The money that he had sent to me.

BY MR. LI:

Q.   Is that the $300 you've been talking about?

A.   Yes.

Q.   Who did you understand Alejandro to be referring to when he asked "did they give you the address"?

A.   The girl that called me.

Q.   In response to Alejandro's message you wrote, "Not yet.   He told me he would confirm and call me back."   Who were you referring to?

A.   The girl that called me.

Q.   And that's the person you described earlier as Daniel's cousin?

A.   Yes.

Q.  Let's skip to Page 3, please.  In the center message in blue which is at approximately 4:13 p.m., you wrote, "She called me already."  Who were you referring to?

A.  The same girl.

Q.  Do you recall what she told you on this phone call?

A.  The address.

Q.  What address?

A.  Where to go pick up the money.

Q.  Do you recall what that address is?

A.  No.

Q.  Do you recall what country it was in?

A.  In Cuba.

Q.  Let's turn to Page 4, please.  So at the very last message here on the bottom of Page 4, at approximately 5:07 p.m. UTC you wrote, "They already picked up the money."  Who were you referring to by "they"?

A.  A friend of mine who did me the favor.

Q.  And what favor are you referring to?

A.  Of going to pick up the money.

Q.  Did you ask your friend to pick up the money?

A.  Yes.

Q.  Did you tell your friend where to go?

A.    Yes.

Q.    How did you know where he should go?

A.    Because on the call that the girl made to me, she gave me the address.

Q.    And were both you and your friend in Cuba at this time?

A.    Yes.

Q.    Did you go with your friend to pick up the money?

A.    No.

Q.    Did your friend return with the money?

A.    Yes.

Q.    Did your friend give you the money?

A.    Yes.

Q.    Do you know who gave your friend the money at the address?

A.    No.

Q.    Was the money in cash?

A.    Yes.

Q.    In what currency was it?

A.    U.S. dollars.

Q.    All right.  Let's switch gears a little bit.  Did there come a time when Alejandro gave you the passwords for his online accounts?

A.    Yes.

Q.    What types of online accounts do you recall him

giving you passwords for?

A.   E-mail and bank.

Q.   Did he explain why he gave you the passwords for his e-mail and bank accounts?

MR. LEVITT:  Same hearsay objections.

THE WITNESS:  He used to tell me that he trusted me a lot and that he wanted me to have them just in case.

BY MR. LI:

Q.   Just in case what?

MR. LEVITT:  Objection.  Relevance.

THE WITNESS:  I do not know what he was referring to.

(Exhibit No. 864 and 864-T was marked for identification.)

BY MR. LI:

Q.   Let's take a look at Government's Exhibit 864-T. So the first message shown here is a message from Alejandro to you dated December 29th, 2023, at approximately 7:13 p.m. UTC.  In that message Alejandro wrote, "And always remember this for everything and keep this message safe.  My passwords for everything are one of these four."  And then there are four redacted lines.

What kinds of passwords did you understand Alejandro to be providing you here?

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

MR. LEVITT:  Repeat the same objections and basis.  Also basis of knowledge.  Also relevance.  Also calling for speculation.

THE WITNESS:  Same thing.  His e-mail and bank accounts' passwords.

BY MR. LI:

Q.  And how do you know that they were e-mail and bank account passwords?

A.  That's what he told me.

Q.  In the next message, Alejandro wrote, "When you come to claim my things, you won't need a lawyer.  Just access the accounts, empty them, and take everything for yourself."  He then continues, "Don't need."

What did you understand Alejandro to mean when he wrote, "When you come to claim my things"?

MR. LEVITT:  Same objections.

THE WITNESS:  He would always say that he wanted to help me, that what was his was mine.  He would always say that sort of thing to me, but I never really knew what he was talking about or why he was saying what he was saying.  And I also was not interested in it.

BY MR. LI:

Q.  What accounts did you understand him to be referring to when he said "Just access the accounts, empty them"?

A.   Bank accounts.

(Exhibit No. 867 and 867-T was marked for identification.)

BY MR. LI:

Q.   All right.  Let's turn to Government Exhibit 867-T.  So these chat messages pick up about two weeks later.  And the first message which is dated January 11, 2024, at approximately 1:03 p.m. UTC, Alejandro wrote as follows, "This weekend I have to go to Rio.  I don't know if the trip will take a weekend or a week, but I hope it won't be too long.  Between you and me and without your grandparents finding out, the tours go into the favelas.  I asked not to go into Santa Marta or the central part of Rio, which are the most dangerous, but something unpleasant could still happen. I'll do everything I can to prevent that from happening. I'm going by car for safety reasons."

MR. LEVITT:  Same objections as well as relevance.

BY MR. LI:

Q.   Where did you understand Alejandro to be referring to when he wrote "I have to go to Rio"?

A.   Rio de Janeiro.

Q.   Did he tell you why he was going to Rio at this time?

A.  Again, another excursion.

Q.  Did he tell you what happened with the earlier excursion?

A.  No.

Q.  What did you understand Alejandro to mean by "the favelas"?

MR. LEVITT:  Objection.  Basis of knowledge. Hearsay.

THE WITNESS:  He used to tell me that the favelas --

THE INTERPRETER:  By the interpreter, the slums.

THE WITNESS:  -- were a set of small houses condensed in a specific area.  And he used to say that the favelas were dangerous.

BY MR. LI:

Q.  In the next message Alejandro wrote, "When I finish the job, which I hope will be quick, you should receive the $9,000."

What job did you understand Alejandro to be referring to here?

MR. LEVITT:  Same objections.

THE WITNESS:  The excursion.

BY MR. LI:

Q.  What was the $9,000 you understood him to be

referring to?

A.   The payment for the excursion.

Q.   Did Alejandro explain why he was going to give you the $9,000?

A.   Well, as I have already said, he would always say that he wanted to help me.  So that was the reason.

Q.   Did he explain how he was going to get you the $9,000?

A.   No.

Q.   Let's jump to Page 4, please.  So in the message at the top of this page, which is from Alejandro at approximately 1:06 p.m., he wrote in response to a message from you.  In response to your message that favela thing why Alejandro wrote, "They're tourist. They want to see ugly parts of Brazil too, and they're going to pay for it."

Who did you understand Alejandro to be referring to by the "tourists"?

MR. LEVITT:  Same objections.

THE WITNESS:  The people for whom he was going to be doing the excursion.

BY MR. LI:

Q.   And do you know who they are?

A.   No.

Q.   In the message at the bottom of this page, which

is in response to your question, "But besides those 9,000 they will pay you more, right?"  Alejandro wrote, "It's 25,000 USD in total if everything goes well as it should."

What did you understand Alejandro to be telling you when he wrote "everything -- if everything goes well as it should"?

A.  If he completes the excursion and do time and the activities planned.

Q.  You had mentioned that there was talk about an excursion back in August of 2023.  Did Alejandro tell you whether that excursion was successful?

A.  No.  Because he had to go back to where he lived then.

Q.  And when you say no, do you mean no, it was not successful?

A.  What I know is that either he had not completed the schedule or fulfilled the schedule or anything that had been planned, but I don't know the exact reason why, but he did leave beforehand.

MR. LEVITT:  Objection to hearsay and speculation.

BY MR. LI:

Q.  How did you learn those things?

A.  Because he told me.

Q. All right. Let's turn back to January of 2024 with the message we were just looking at. What do you understand Alejandro to be telling you when he wrote it's 25,000 USD in total?

A. The money that he was going to be paid for the excursion.

Q. You testified earlier that Alejandro said he would be giving you the $9,000. Did he explain what would happen with the remaining money?

A. No.

Q. I have just a couple more questions and then we'll take a break. Let's turn to the next page which is Page 5. In the top message in response to your question, "Is it with the same people as last time?" Alejandro answered "yes." What were you discussing in this exchange with Alejandro?

A. I was asking him if it was going to be through the same girl with whom the money had been sent that last time.

Q. Let's take a look at the last message from Alejandro at the bottom of this page. Here Alejandro writes, "He has 9,000 in Cuba, according to what he told me, and since my payment may take a while because it has to be exchanged and all that, and Western Union only exchanges 1,950 per day, I asked him to release those

9,000 in Cuba for you and pay me the rest little by little."

MR. LEVITT:  Objection.  Hearsay.

BY MR. LI:

Q.  When Alejandro wrote "he has 9000 in Cuba," who did you understand Alejandro to be referring to?

MR. LEVITT:  Objection.  Called for hearsay and speculation.

THE WITNESS:  The person for whom he had done the excursion.

BY MR. LI:

Q.  And what country were you living at that time?

A.  Cuba.

Q.  All right.  Let's take a break here.

THE VIDEOGRAPHER:  Going off the record. The time is 11:27.  End of Media Card Number I, Volume I, for the video deposition of Dailyn Hernandez.

(Recess taken from 11:27 a.m. to 11:50 a.m.)

THE VIDEOGRAPHER:  This is the beginning of Media Card Number 2, Volume I, in the video deposition of Dailyn Hernandez.  Going on the record, the time is 11:50 a.m. local time in Spain.

(Exhibit No. 871 and 871-T was marked for identification.)

BY MR. LI:

Q.  All right.  Let's turn to Government Exhibit 871-T, please.  I'm going to ask that we read the messages shown in this exhibit.  Again, I'll read the messages for Alejandro in green on the right.  If you would please read the messages in blue on the left.

MR. LEVITT:  858?

MR. LI:  871-T.

BY MR. LI:

Q.  So the first message is from Alejandro on January 14th of 2024, approximately 4:10 p.m. UTC.  It reads, "Quick breaking news."

A.  "Tell me quickly no audio.  Is it good?"

MR. LEVITT:  Objection to hearsay.

BY MR. LI:

Q.  "The nine should arrive by the 24th and I'll head back home tomorrow.  Everything went really well.  Your house is on the way."  So staying on this page, which is Page 2, what did you understand Alejandro to be telling you when he write "the nine should arrive by the 24th"?

A.  The 9000, the money that was going to be given to me would be getting there on the 24th.

Q.  And the 24th of what month?

A.  January.

Q.  January 2024?

A.  Yes.

Q.   What did you understand Alejandro to be telling you when he wrote everything went really well?

A.   That the excursion had gone well.  That he had did it well.

Q.   What house did you understand him to be referring to when he said "your house is on the way"?

A.   He was referring to the same thing that he had said previously about my -- the house of my dreams here in Spain and what he was saying is that that money could be used to purchase the house.

Q.   Did there come a time when you received some of the $9,000 that Alejandro promised?

A.   Yes.

Q.   How much did you receive?

A.   5,000.

Q.   How did you get the money?

A.   I received a call; I was given an address, and I went to pick it up.

Q.   Who called you?

A.   The same girl from the prior time.

Q.   Where did you pick up the money?

A.   At the address she gave to me.

Q.   And when you said the same girl as the prior time, are you referring to the person you described earlier as Daniel's cousin?

A.   Well, the one that had identified herself as such.

Q.   Do you recall the address where you went to pick up the money?

A.   No.

Q.   What country was it in?

A.   In Cuba.

Q.   Did you personally get the money this time?

A.   Yes.

Q.   Who gave you the money?

A.   The girl that called me.

Q.   Do you recall her name?

A.   No.

Q.   Was the money in cash?

A.   Yes.

Q.   In what currency was it?

A.   Same, U.S. dollars.

Q.   Did you meet Daniel in person in connection with this transaction?

A.   No.

Q.   Did you ever meet with him in person?

A.   No.

Q.   Did you communicate with Daniel over WhatsApp?

A.   Yes.

Q.   How did you get his contact information?

A.  Alejandro gave me his number.

Q.  Do you still have Daniel's contact information?

A.  No.

Q.  Do you recall the phone number that Daniel used to communicate with you over WhatsApp?

A.  No.

Q.  Do you recall the country code?

A.  +1.

Q.  Do you know what country or countries that corresponds to?

A.  The United States.

Q.  During this time period, this being approximately August 2023 to approximately January 20, 2024, did Alejandro speak to you often about Daniel?

A.  No.

Q.  Did Alejandro tell you where Daniel was located?

A.  No.

Q.  Did Alejandro tell you where Daniel was located?

A.  He told me in the beginning that when he first spoke about this friend that he was in the United States, and he told me that his friend was Daniel, but I don't know if it's the same Daniel.

Q.  Did Alejandro talk to you about multiple Daniels?

A.  No.  No.  Just Daniel, but since I never met him, I don't know how close they were.

Q. And when you say just Daniel, what do you mean by that?

A. Daniel the name.

Q. When Alejandro discussed Daniel with you, did he appear to be referring to a single person or multiple people?

MR. LEVITT: Objection. Asked and answered.

THE WITNESS: Just one.

BY MR. LI:

Q. As far as you can recall, did Alejandro tell you anything else about Daniel?

A. No.

Q. Did you keep your WhatsApp chats with Daniel?

A. No.

Q. Did you delete them?

A. Yes.

Q. And why did you delete your chats with Daniel?

A. I usually delete everything. I do not save any types of chats or any sort of information that is just not going to be important to me.

Q. And so do you have a practice of deleting your WhatsApp chats with people with whom you correspond?

A. Yes, it is a bad habit, but yes, that's my habit.

(Exhibit No. 873 and 873-T was marked for identification.)

BY MR. LI:

Q.   Let's turn to Government Exhibit 873-T.  So this excerpt begins with your message to Alejandro dated January 16th, 2024, at approximately 1:57 a.m. UTC. Let's read aloud the first few messages, please.  And as before, you can read your messages in blue, and I'll read Alejandro's messages in green.

A.   "Hey."

Q.   "Tell me what happened."

A.   "Did you tell someone to text me?"

Q.   "No."

A.   "Daniel."

Q.   "Unless it's Daniel trying to reach you to give you that.  If it's Daniel answer yes."

A.   "To give me what?"

Q.   "Answer him."

A.   "Yes."

Q.   "The 9,000."  Let's pause there.  So --

          MR. LEVITT:  Repeating the same objections.

BY MR. LI:

Q.   In exchange we just read, you and Alejandro refer to Daniel.  Who is Daniel?

A.   The person through whom he was sending me the money.

Q.   Is that the same Daniel you described in

connection with the $300?

A.   Yes.

Q.   And here there's a reference to $9,000; what is the 9,000?

A.   From what he was going to be paid for the excursion.

Q.   And by "he," you're referring to Alejandro?

A.   What Alejandro was going to be paid, yes.

Q.   All right.  Let's continue reading and we'll start with your message at the middle of this page which is at approximately 1:59 a.m. UTC.

A.   So this one, right?

Q.   Yes.

A.   "To give me what?"

Q.   I apologize.  We're in the middle of Page 4, and the message is at 1:59 a.m.  It's your message on the left.

A.   Okay.  I'm sorry.  "Damn already he tells me we have to speak."

Q.   "All right.  Talk to him."

A.   "Okay."

Q.   "What did he want?"  Let's pause there.  So in the exchange we just read, Alejandro told you to talk to him; who did you understand Alejandro to be referring to?

MR. LEVITT:  Repeating same objections.

THE WITNESS:  Daniel.

BY MR. LI:

Q.  Did you, in fact, speak with Daniel?

A.  Yes.

Q.  Was it over the phone?

A.  Yes.

Q.  Do you recall what Daniel said on the call?

A.  No, I do not remember.

Q.  Why don't you take a look at the next message on this page.  Just read it to yourself and let me know if that helps you remember.

A.  Okay.

Q.  Do you now remember some of what Daniel told you on that call?

A.  Yes, some.

Q.  What do you recall?

A.  That I should speak with his cousin so she and I could make arrangements for her to give me the 5000, and that then when he came in February, he would give me the other -- another 3,000 totalling 8,000.

MR. LEVITT:  Objection to hearsay and hearsay within hearsay.

BY MR. LI:

Q.  And when you referred to "he," for example, that

he would give you 3000 in February, who are you talking about?

A.   Daniel.

Q.   And when you said -- when you referred to Daniel's cousin, who were you referring to?

A.   The person who called me.

Q.   And when you say the person who called you, are you referring to the same person who called you in August 2023 in connection with the $300 payment?

A.   Yes.

Q.   All right.  Let's now continue reading please on this page.  And we can begin with your message at 2:06 a.m. in the middle of the page.

A.   "Very nice."

Q.   I'm sorry.  One message above that.

A.   Oh, this one here.  Okay.

"He says he'll talk to his cousin tomorrow to make arrangements.  He was coming next week but something came up and now he's coming in February.  His cousin will give me 5,000 and he'll give me 3,000 in February total 8000."

Q.   Let's pause there.  So first of all, in this message, were you describing the call with Daniel?

MR. LEVITT:  Objection.  Leading.

THE WITNESS:  Yes.

BY MR. LI:

Q.   You wrote, "He says he'll talk to his cousin tomorrow to make the arrangements."  Who are the two people you're referring to in that sentence?

A.   Daniel and his cousin.

Q.   In the next sentence you wrote, "He was coming next week but something came up and now he's coming in February."  What location were you referring to?

A.   Cuba.

Q.   You then wrote, "His cousin will give me 5,000 and he'll give me 3,000 in February."  What were you referring to by the 5,000 and the 3,000?

A.   The money that Alejandro was talking about.

Q.   You testified earlier that you received $5,000 in cash.  Did you ever receive the other $3,000?

A.   No.

Q.   Let's flip all the way to the last page, Page 14, please.  And we're still on Government Exhibit 873-T. So in the center message here in blue, which is dated January 16th, 2024, at approximately 2:17 a.m. UTC, you wrote, "I'll pick it up tomorrow."  What were you referring to when you wrote you would pick it up?

A.   The money.

Q.   And is that the $5,000 you described earlier?

A.   Yes.

Q.  And did you, in fact, pick up that $5,000 on or around January 17th, 2024?

A.  I do not recall the exact date, but I did go pick it up.

Q.  Other than the approximately $5,000 you received sometime around this message and the $3,000 you received in August 2023, did you receive any other money from Daniel?

A.  No.

(Exhibit No. 874 and 874-T was marked for identification.)

BY MR. LI:

Q.  Let's turn now to Government Exhibit 874-T.  And let's read aloud the messages on the first two pages, please.

MR. LEVITT:  I'm sorry, what's the number again?

MR. LI:  874-T.

MR. LEVITT:  Same objections.

BY MR. LI:

Q.  As before, I'll read Alejandro's messages in green, and you can read your messages in blue.  First message is from Alejandro on January 17th, 2024, at approximately 1:02 p.m. UTC.  "Well, I have good news and bad news."

A.   "Oh, tell me."

Q.   "The good news is that I'll get the phone today and I'll take it to the girl so she can deliver it to you on the 20th of next month.  The bad news which isn't so bad is that they kept talking and telling me about it and they convinced me.  I can't leave from here in a totally legal way, but anyway once I reach the border I'll start jumping.  I'm leaving here for the United States."  And we can pause here.

So directing your attention to the first message, I should say the first green message on this page, which is Page 2, what did -- Alejandro to be referring to by the phone?

A.   I had a phone that was having issues, and he wanted to send me another one.

Q.   He being Alejandro?

A.   Yes.

Q.   Who is the girl that he refers to in this message?

A.   A girl that had an agency -- a package shipping agency.

Q.   And to your understanding, what role would that girl play in getting you the phone?

A.   She had a package shipping agency, and so he was going to send it through her.

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

Q.  To Cuba?

A.  Yes.

Q.  Directing your attention to the last two messages from Alejandro on this page, he refers to leaving from here to the United States.  Where is "here"?

A.  Brazil.

Q.  In those messages Alejandro also refers to jumping, what did you understand Alejandro to mean by jumping?

A.  He is talking about crossing borders.  In Cuba when many people leave and they have to go through borders, they use that term, jumping.

Q.  And when you say go through borders in that context, are you referring to legally going through borders or illegally going through borders?

A.  Illegally.

Q.  Let's jump ahead to Page 5, please.  So at the top here you send two messages.  The first at approximately 1:07 p.m. UTC.  Your messages reads, "Who is going to help you, Daniel?"  In response to your message Daniel, Alejandro wrote, "Partly.  That's when I get up there.  Down here are the coyotes of a great friend of mine."  So let's pause there.

MR. LEVITT:  Continuing objection to hearsay.

DAILYN HIDALGO HERNANDEZ                                  JOB NO. 2563037
APRIL 08, 2026

BY MR. LI:

Q.   Who is the Daniel that you and Alejandro are discussing in this exchange?

A.   The one that was getting the money that Alejandro would send to me, to me.

Q.   The same Daniel we've been discussing throughout our conversation today?

A.   Yes.

Q.   What did you understand Alejandro to mean when he wrote "down here"?

A.   Brazil.

Q.   What did you understand Alejandro to mean when he wrote "up here"?

A.   The United States.

Q.   What did you understand Alejandro to mean by coyotes?

A.   The people that have individuals who are crossing the border -- cross the boarder.

Q.   Let's go to Page 8, please.  At the top of this page we have a message from Alejandro to you, and his message is dated January 17th, 2024, at approximately 1:10 p.m. UTC.  His message is in response to your message read -- reading, "I support you but it's that I didn't know about that."  In response to that message Alejandro wrote, "It's just that it all happened

yesterday.  Daniel called me, we were talking and he presented it to me as an option.

MR. LEVITT:  Same objection.

BY MR. LI:

Q.  Based on your understanding of this message, what was the option that Daniel presented to Alejandro?

MR. LEVITT:  Objection.  Calls for speculation.

THE WITNESS:  Well, for him to go to the United States.

BY MR. LI:

Q.  And let's turn to the very last page of this exhibit, which is Page 15.  And in that last message, which is dated January 17th, 2024, approximately 1:16 p.m. UTC, Alejandro wrote, "Because looking at it after one year in the United States I can apply for residency, and with help and money I can pay for anything and go to Spain with you."

What did you understand Alejandro to be telling you about his plan?

A.  Well, that he would go to the United States and then because of his constant idea of him being by my side, he would go to Spain.

(Exhibit No. 875 and 875-T was marked for identification.)

BY MR. LI:

Q.  Let's go to Government Exhibit 875-T, please. And let's jump ahead to Page 3.  On this page Alejandro sends two messages starting January 17th, 2024, at approximately 1:32 p.m. UTC.  The two messages read as follows, "Keep Daniel's number safe in case I need it at any time.  Also just in case you don't hear from me directly call him and well, he'll know what to do."

Who did you understand Alejandro to be referring to by Daniel in these messages?

A.  Daniel, the guy that was going to help him, the one that had presented the idea of him going to the United States and that according to what he was saying was going to help him somehow.

Q.  And is that the same Daniel you've described as the person who helped get you the $300 and the $5,000?

A.  Yes.

Q.  What did you understand Alejandro to be telling you in this last message?

A.  That if I didn't hear from him I should call him.

MR. LEVITT:  Yeah, just repeating my same objections.

BY MR. LI:

Q.  If you didn't hear from who to call who?

A.  That if I did not hear from Alejandro I should

call Daniel.

Q.   Did Alejandro explain to you why you should call Daniel?

A.   No.

Q.   Did there come a time when you did, in fact, have another call with Daniel?

A.   Yes.

Q.   How did that come about?

A.   Can you please repeat that question?

Q.   Sure.  What were the circumstances that caused you to have a second call with Daniel?

        MR. LEVITT:  Object to the form of the question.

BY MR. LI:

Q.   Let me ask it more simply.  Why did you have another call with Daniel?

        MR. LEVITT:  Object to the form of the question.

        THE WITNESS:  Because I had received a call from Alejandro's attorney that he was in jail, so that was why.

BY MR. LI:

Q.   After you received this call from Alejandro's attorney, why did you decide to call Daniel?

        MR. LEVITT:  Object to relevance.

THE WITNESS:  Well, because he had texted me to do so.

BY MR. LI:

Q.  And when you say he had texted you, who are you referring to?

A.  Alejandro.

Q.  And are you referring here to the text message in front of you that is the last message in Government Exhibit 875-T?

A.  Yes.

Q.  Do you recall the substance of the call with Daniel?

A.  No.

Q.  Did you discuss Alejandro's arrest on the call?

MR. LEVITT:  Objection.  Leading.  She said she didn't remember.

THE WITNESS:  I don't quite remember much, to be honest.

BY MR. LI:

Q.  As far as you can call, was that call you just described and the earlier call to arrange the $5,000 pickup?

MR. LEVITT:  Objection.  Asked and answered. She said she didn't remember the call.  And I object to the leading as well.

BY MR. LI:

Q.   So let me start over.  As far as you can recall, was the call you just described and the earlier call to arrange the $5,000 pick up the only two calls that you had with Daniel?

A.   Yes.

(Exhibit No. 712 was marked for identification.)

BY MR. LI:

Q.   All right.  Just a few final questions.  Could you please turn to Government Exhibit 712 at the front of your binder.  Do you recognize what's shown here?

A.   Yes.

Q.   What is it?

A.   My phone number.

Q.   Is this a screenshot of what appears to be a WhatsApp communication?

A.   Yes.

Q.   Does it include your WhatsApp communications?

A.   Yes.  As far as you can tell, does it appear to be a true and accurate screenshot of certain of your WhatsApp communications.

MR. LEVITT:  Objection.  Hearsay.

BY MR. LI:

Q.   You can answer.

A.   Yes.

Q.  All right.  Let's turn to Government Exhibit 712-T.  And this contains both the original screenshot in Spanish as well as an English translation of the screenshot.

A.  712?

Q.  712-T.  It's just two pages past where you were.  Do you see a phone number reading +53 5 353 9218 on the screenshot?

A.  Yes.

Q.  Do you recognize that phone number?

A.  Yes, it's mine.

Q.  Now, in the messages themselves there are certain messages in white to the left.  Who sent those messages?

A.  I did.

Q.  And then there's some messages in green to the right.  Who sent the messages in green?

A.  Daniel.

Q.  In the second message -- let me rephrase.

In the first two messages we see here, which are time stamped at 5:30 p.m., you wrote, "Daniel, it's Dailyn."  In the context of this screenshot, who is Daniel?

A.  The person who was going to give me the money from Alejandro.

MR. LI:  All right.  I have no further

questions at this time.  I believe Mr. Levitt will have some questions for you.  And after he is done, I may have a few follow-up questions.

EXAMINATION

BY MR. LEVITT:

Q.  Good afternoon, Ms. Hernandez.

A.  Good afternoon.

Q.  My name is Richard Levitt.  Along with my co-counsel, Florian Miedel, we represent Daniel Sikkema.  You and I have not met before, have we?

A.  No.

Q.  Well, it's nice to meet you now.

A.  Likewise.

Q.  The exhibit that you were just showed by the Government, 712-T, did you see a date on that exhibit?

A.  No.

Q.  Okay.  Now, you haven't spoken with anybody previously who represents Mr. Sikkema, have you?

A.  No.

Q.  Okay.  But you've spoken with representatives of the government on several occasions; is that correct?

A.  Yes.

Q.  I don't expect you to remember all the dates, but do you remember first having a video conference with the Government on or about July 3rd of 2025?

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

A.    2024, no.

Q.    No.  I'm sorry, 2025.

A.    Oh, right, yes.

Q.    Okay.  And if I told you that you also had conversations with the government on several other occasions, perhaps as many as seven or seven or eight other occasions, would that sound about right?

A.    Yes.  Although I do not remember exactly how many times.

Q.    Of course.  Did the government tell you that you were required to testify as a government witness?

A.    I was told that by law I was required to testify, yes.

Q.    Did anybody give you a piece of paper that ordered you to give this testimony?

A.    Attend the appointment, yes.

Q.    And what document was that, if you recall?

A.    A summons.

Q.    Uh-huh.  And during the meetings that you had with the government, did anybody tell you that you were entitled to be represented by a lawyer?

            MR. LI:  Objection.  Relevance.

            THE WITNESS:  No.

BY MR. LEVITT:

Q.    And did you ever have a lawyer -- withdrawn.

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

Q. Did you ever speak with a lawyer before meeting with the government on any of the occasions that you met with the government?

A. No.

Q. And did the government offer to get you a lawyer if you wanted a lawyer?

MR. LI: Objection. Relevance.

THE WITNESS: No.

BY MR. LEVITT:

Q. Did you ever have a lawyer sit with you through any of the conferences that you had with the government?

A. No.

Q. So at no time did the government offer you a lawyer, and at no time did you have a lawyer; is that correct?

MR. LI: Objection. Relevance.

THE WITNESS: Yes. Yes.

BY MR. LEVITT:

Q. Without getting into the specifics, you've had certain health problems; is that correct?

MR. LI: Objection. Relevance.

THE WITNESS: Yes.

BY MR. LEVITT:

Q. And would it be fair to say that sometimes you go blank?

THE INTERPRETER:  May the question be repeated for the interpreter, please?

MR. LEVITT:  Yes.

BY MR. LEVITT:

Q.  Would it be accurate to say that at times you go blank in your mind?

MR. LI:  Objection.  Form.

THE WITNESS:  No.

BY MR. LEVITT:

Q.  Well, would it be true that at sometimes you forget things?

A.  No.

Q.  Do you -- one second, please.  Do you remember having a conversation with a representative of the government on or about January 18th of this year when you said that your mind sometimes goes blank?

A.  Well, it's not that my mind goes blank.  It is just that sometimes I get nervous.  I have so many problems that sometimes I get blocked, but that does not mean that I forget, do not remember, or that I have any sort of mental health issues.

Q.  Uh-huh.  Now, you testified on direct examination that you met Alejandro on WhatsApp, correct?

A.  Yes.

Q.  And that was around December of 2020; is that

right?

A.   Yes.

Q.   Were you introduced to him by somebody else?

A.   Yes.

Q.   And who was that?

A.   A female friend of mine.

Q.   Uh-huh.  And would it be accurate to say that you first met him in person sometime in 2021?

A.   Yes.

Q.   Okay.  Now, is it also accurate that two years before you met Alejandro, you had also met a man named Jose Miguel?

THE INTERPRETER:  For the interpreter, Jose Miguel?

MR. LEVITT:  Yes.

THE INTERPRETER:  Thank you.

THE WITNESS:  I know lots of Jose Miguels.

BY MR. LEVITT:

Q.   Okay.  I'm sorry.  What is the name of your husband?

A.   Jose Miguel Chao.

Q.   Okay.  So I am referring to that Jose Miguel.

A.   Okay.

Q.   And did you meet him approximately two years before you met Alejandro?

A.   I met him in 2018, and I met Alejandro on WhatsApp around 2020.

Q.   Right.  So it was approximately two years before you met Alejandro that you had met Jose Miguel; is that right?

A.   Yes.

Q.   And at some point thereafter you exchanged rings and began what you would refer to as a committed relationship?

A.   No.  The ring was between 2022 and 2023 right before my surgery.

Q.   Uh-huh.  So at that time you exchanged rings; is that correct?

A.   We had them made.

Q.   I'm sorry?

A.   We had them made.

Q.   And you consider yourself married, don't you?

          THE INTERPRETER:  For the interpreter, you considered or consider?

BY MR. LEVITT:

Q.   You consider yourself and Jose Miguel to be married to one another?

A.   Not on paper.

Q.   Right.  But you consider yourself in a committed relationship with him?

DAILYN HIDALGO HERNANDEZ                                JOB NO. 2563037
APRIL 08, 2026

A.   Yes.

Q.   And by the way, if I ask you a question that is confusing or you don't understand, please let me know and I'll be happy to rephrase it.

A.   Okay.

Q.   Do you sometimes refer to your -- to Jose Miguel as Chao?

A.   Yes.

Q.   And that's his last name, correct?

A.   Yes.

Q.   And I believe you testified on direct examination that to your recollection, Alejandro moved to Brazil sometime in 2021; is that correct?

A.   Yes.

Q.   But of course you remained in touch with him via WhatsApp and telephone after he moved to Brazil, correct?

A.   Yes, on WhatsApp.

Q.   Uh-huh.  Alejandro, in fact, when he was still in Cuba, had been to your house, hasn't he?

A.   Yes.

Q.   And he's meet Chao, correct?

A.   Yes.

Q.   And he knows that you and Chao live together, correct?

A.   Yes.

Q.   And Alejandro has said that he doesn't like Chao; hasn't he said that?

A.   Yes.

Q.   Uh-huh.  Nonetheless, Alejandro had continued to express his love for you, didn't he?

A.   Yes.

Q.   And you had told him that you just wanted to be his friends -- his friend?

A.   Yes.

Q.   But he nonetheless would persist and was very obsessed with you?

A.   Yes.

Q.   And even though Alejandro had made clear that he doesn't like Jose Miguel, you still kept up a running relationship on WhatsApp with him, correct?

         MR. LI:  Objection.  Form.  403.

         THE WITNESS:  Could you please ask me that again?

BY MR. LEVITT:

Q.   Sure.  You knew that Alejandro did not like Jose Miguel, correct?

A.   Yes.

Q.   But you still kept up a long-running relationship on WhatsApp with Alejandro, correct?

A.    Yes.

Q.    Uh-huh.  Now, during the course of knowing Alejandro, he would sometimes text you multiple times a day, correct?

A.    Yes.

Q.    In fact, between August of 2023 and January of 2024, it would be fair to say that if those messages were all printed out on paper, they would be nearly 5,000 pages of messages; is that about accurate?

MR. LI:  Objection.  602.

THE REPORTER:  Objection what?

MR. LI:  602, basis of knowledge.

THE WITNESS:  I don't know.

BY MR. LEVITT:

Q.    Have you ever seen a printout of those messages?

A.    No.

Q.    Let me show you what's been provided to us by the government and identified as 3501-01.

MR. LEVITT:  Do we have a printout of these, may I ask?

MR. LI:  I don't.  Is this the full WhatsApp?

MR. LEVITT:  Yeah.

MR. LI:  I don't have a printout, a full one.

MR. LEVITT:  No, you didn't want to printout 5000 pages?

MR. LI:  I did not printout.

BY MR. LEVITT:

Q.  Okay.  Let's see if I can do it this way.  I'm sorry to interrupt.  I am approaching you now, and I want to show you that document that I just identified, and I obviously don't want you to read through the entire document.  But I would ask you whether or not this appears to be WhatsApp messages between you and Alejandro.  And I can scroll a little bit for you with two fingers going up, you can do the same thing. And -- two fingers.

Again, I'm not asking you to read 5000 pages. And let me stop you for a moment and ask you whether you can see the date, and I'll make this a little bigger if I can.  If you can see the date on the first message or one of the first messages and see whether it's August 17th of 2023?

A.  Yes.

Q.  Okay.  And now I'm going to go down to the last message and see whether or not you can see it says January 20th of 2024.

A.  Yes.

Q.  And now I'm going to ask whether or not you can

read the little page number down there.  Can you see that number?  See that down here?

A.  Yes.

Q.  And what page number is that?

A.  4872.

Q.  Okay.  Thank you.  So between August 17th of 2023 and January 20th of 2024, you see how printed out these messages cover about 4,872 printed pages, correct?

A.  That's what I was shown.  That's what I saw.

Q.  Uh-huh.

MR. LI:  I'm sorry to interrupt.  Just the Webex has a message in Spanish.  I'm not sure what it says.  May I ask the interpreter?

THE INTERPRETER:  "There has been no activity in a while.  Should I close?"

MR. LI:  We're going to hit no.

MS. SANCHEZ:  That's what we are trying to do.  We're going to call in the tech.

MR. LI:  I'm sorry to interrupt.  I just want to make sure your client stays on.

MR. LEVITT:  I assume he can hear because otherwise he'd be doing something.  I don't know.  All right.  We'll continue.  Okay.  Yeah.

All right.  The Webex, is that the feed that Mr. Sikkema is getting?

MR. LI:  Yes.

MR. LEVITT:  And they said that there's been no activity?

MR. LI:  I think it's just saying that we haven't done anything with the Webex for some time, and so it's asking do we want to keep the Webex open.

MR. LEVITT:  Or otherwise they --

MR. LI:  Or -- yeah.  If we don't keep it open, they'll get disconnected.

MR. LEVITT:  If we have ongoing testimony, why would they believe we haven't done anything for sometime?

MR. LI:  I think it's likely because nobody has moved a curser or --

MR. LEVITT:  Oh, I see.

MR. LI:   -- or anything on the computer.

MR. LEVITT:  Okay, fair enough.

MR. LI:  But perhaps I can do something and keep it active.

BY MR. LEVITT:

Q.  Okay.  So I'll continue.  So during the period August 17th of 2023 to January 18th of 2024, to your understanding, Alejandro was in Brazil, correct?

A.  Yes.

Q.  And while you were engaging in these 5,000 or

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

nearly 5,000 pages of texts with him over a period of approximately five months, you considered him to be too intense, didn't you?

A.  Yes.

Q.  And, in fact, you would only reply to his texts occasionally.  So you had many less texts to him than he had to you, correct?

A.  Yes.

Q.  And when we talk about how intense his communication seemed, would it be fair to say that you would consider them intense both because of the sheer number of messages he sent you and also because of the types of things he would say to you?

A.  Yes.

Q.  Now, on your direct examination, you were asked about Alejandro providing you identifying numbers and passcodes for various bank accounts, correct?

A.  Yes.

Q.  And he told you that he did this because he thought he might die at some point by suicide or otherwise, correct?

A.  Yes.

Q.  And he expressed thoughts about killing himself after his mother passed away, didn't he?

A.  Yes.

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

Q.   Now, during the time that you and he knew one another, he sometimes spoke about the work he had done in Cuba, didn't he?

MR. LI:  Objection.  Scope.

MR. LEVITT:  Objection what?

MR. LI:  Scope.

MR. LEVITT:  I'm sorry, what was the answer?

THE INTERPRETER:  There was no answer.  The interpreter was repeating -- was interpreting.

THE WITNESS:  At times.

BY MR. LEVITT:

Q.   Uh-huh.  And he told you that he worked security, didn't he?

MR. LI:  Objection.  Scope.

THE WITNESS:  Well, he talked about his -- he mentioned that he was working at a bike repair shop and then also that he was working as security.  He was doing security work at this house, but I don't know if that was during the same time or at night.

BY MR. LEVITT:

Q.   And was it your recollection that the house he was working at was in the municipality of Vedado or Nuevo Vedado?

THE INTERPRETER:  For the interpreter, may the name be spelled out?

DAILYN HIDALGO HERNANDEZ                                    JOB NO. 2563037
APRIL 08, 2026

MR. LEVITT:  Vedado, V as in Victor, E, D as in David, A, D as in David, O.

THE INTERPRETER:  Thank you.

MR. LEVITT:  Or Nuevo.

MR. LI:  Objection.  Scope.  And I'll just note the time-out warning of the Webex has gone away, so it appears.  The defendant is able to remain fully connected to the Webex.

MS. SANCHEZ:  Yes, he is.  He has been and he -- or outside he used the controls and he makes sure that it is active.

MR. LI:  Thank you.

MR. LEVITT:  That was not the witness' answer.

THE WITNESS:  No.  Can you please repeat the question?

BY MR. LEVITT:

Q.  Of course.  So we were talking about the work that Alejandro told you that he had done in Cuba.  And one of the things he told you he did was work for security at somebody's house; is that right?

MR. LI:  Objection.  Scope.

THE WITNESS:  Yes.

BY MR. LEVITT:

Q.  And was it your recollection that he said that

this house was in municipality Vedado or Nuevo Vedado?

MR. LI:  Objection.  Scope.

THE WITNESS:  Yes.

BY MR. LEVITT:

Q.  Now, you also had conversations with Alejandro during which he said that Daniel owed him money, correct?

A.  I don't know if he owned him any money.  He said that he was going to be paid certain moneys for the excursion that he was going to be doing and that he would send it to me through his friend named Daniel.

Q.  Well, did he say that he was owed money for the work that he had done in Cuba?

A.  Yes.  Well, no.  Not the work in Cuba, no.  The excursion.

Q.  Uh-huh.  Do you remember telling the government-in one of your interviews with the government, do you remember telling the government that you had learned that Daniel was in the United States and that Alejandro had told you that he was a friend that owed him some money?

A.  Yes.

Q.  It's also true, isn't it, that you didn't know whether the things that Alejandro told you were true or not true, correct?

A.   Yes.  I mean, I didn't really pay him much mind because everyone lives their own life, so I don't know if what he is telling me is something that he is really thinking or not.

Q.   Well, he told you, for example, that he was giving Spanish classes in Brazil; do you remember that?

A.   Yes.

Q.   But you didn't know whether that was true or not true, correct?

A.   No.

Q.   He told you that he was doing electrical work for parties organized by a female friend; do you remember that?

A.   It wasn't an electrical -- it wasn't electrical work.  It was like a doorman.

Q.   A doorman at the party?

A.   Yeah, like he was welcoming guest.

Q.   But you didn't know if that was true or not, correct?

A.   No.

Q.   He told you he was writing poems and selling them online?

A.   Yeah.  That he was writing poems and that he wanted to sell them online and that he was trying to get it done, but I don't know if, in fact, it was true or

not.

Q.   Uh-huh.  He also told you that he was doing gardening work; is that right?

A.   Yes.

Q.   But you didn't know if that was true or not true, correct?

A.   No.

Q.   And he also told you that he was being paid a great deal of money to take a group of tourists around the favelas; is that right?

A.   To do an excursion, whether they were inside or outside the favelas, I don't know.  That is what he was telling me.

Q.   And at different times he said he was making different amounts of money; is that right?

A.   Yes.

Q.   And he told you at one point, for example, that he would be receiving $20,000 for his work with the tourists?

A.   On many occasions he would talk about amounts, but I never really paid attention to that.  I never really looked into it.

Q.   You didn't pay attention because you didn't know whether he was being truthful, or you didn't care, or something else?

A.   Well, it was because I really did not care.  He would say so many things, you know, about what happens in the world of capitalism.  You know, things that I just did not know or in the place or in the area where I lived.  I just didn't know if these things existed, but he would talk about the fact that in a capitalist world that they were such and such amount.  But to be honest, I never really paid him any mind.

Q.   Uh-huh.  You -- do you remember your testimony a little while ago about the $300 that you received?

A.   Yes.

Q.   Uh-huh.  And at some point in time you recall that Alejandro had told you that he was going to help you purchase a table for a nail salon; is that right?

A.   Yes.

Q.   And you told us on direct examination that he had a friend in the United States that would be sending the money?

A.   Yes.

Q.   And was it your understanding that Alejandro would be sending the money to his friend who would then send it to Cuba?

A.   Yes.

Q.   Thereafter, you received a call from a woman saying that she was calling on behalf of Alejandro and

that you could pick the money up; is that right?

A.   Yes.

Q.   And you couldn't go yourself, so you asked a friend to pick it up, right?

A.   Yes.

Q.   And that's how you received the $300?

A.   Yes.

Q.   And you also testified about receiving $5,000, correct?

A.   Yes.

Q.   Now, initially Alejandro had said that when he finishes the job that he was working on, he would receive $9,000; do you remember that?

A.   Yes.

Q.   But before you received the money, Alejandro called you on WhatsApp and told you you would receive it, correct?

A.   Can you please ask me that again?

Q.   Sure.  He -- Alejandro had told you to expect $9,000, didn't he?

A.   Yes.

Q.   And your understanding was that Alejandro would be sending the money to Daniel, and Daniel would be sending it to Cuba; is that correct?

A.   Yes.  How he was going to send it, I don't know,

but yes.

Q.   And so at some point in time you spoke with Daniel; is that right?

A.   Yes.

Q.   And your impression was that Daniel sounded normal and kind on the phone; is that correct?

A.   Yes.

Q.   And eventually, in fact, you received $5,000, correct?

A.   Yes.

Q.   At some point in time as you were trying to remember these events, did you think it was $4,000 that you received not $5,000?

A.   Yes.  I just couldn't remember the exact amount.

Q.   But having received the $5,000, you never received the balance of the $9,000 he said he would send you, correct?

A.   Correct.

Q.   And what did you do with the $5,000?

A.   I was exchanging the money.  I was using it in things at the house, medication for my grandparents.

Q.   Now, when was the last time you actually spoke via messenger or otherwise -- withdrawn.

When was the last time you communicated directly via WhatsApp or otherwise with Alejandro?

A.  I do not recall the date.  It was before his lawyer called me.

Q.  And was it -- withdrawn.

In fact, at some point in 2024, you blocked his number; is that right?

A.  Yes.

Q.  And do you remember approximately when that was?

A.  No.

Q.  And did he thereafter try to contact you via a messenger in October of 2025?

A.  Yes.

MR. LEVITT:  May I have one moment with my cocounsel?  I'm going to step outside.

(Off-the-record.)

MR. LEVITT:  Ms. Hernandez, I have no other questions for you.  Thank you.

FURTHER EXAMINATION

BY MR. LI:

Q.  I just have a handful of questions.  On cross-examination you were asked about your memory; do you recall that?

A.  Yes.

Q.  And I believe you were shown some chat messages between you and Alejandro between approximately August 2023 and January 2024; do you recall that?

A.   Yes.

Q.   What is today's date?

A.   April 8th, 2026.

Q.   So fair to say the events we've been talking about were about two, two and a half years ago?

A.   Yes.

Q.   Are there details about the events between August 2023 and January 2024 that you don't remember clearly?

A.   Can you please ask me differently?

Q.   Yeah, let me ask a better question.  Do you remember clearly everything that happened two and a half years ago?

A.   Not exactly in detail, no.

            MR. MIEDEL:  Can we just pause for a minute? Our client is in the bathroom, so...

            MR. LI:  Oh, I apologize.  We're going to pause just for a moment.

                    (Off-the-record.)

            MS. SANCHEZ:  He's back.

BY MR. LI:

Q.   In preparation for your testimony today, did you review certain of your text messages between August 2023 and January 2024?

A.   Whenever I have come to the prosecutor's office

with the evidence.

Q.  And you're referring here by evidence to some of your text messages with Alejandro?

A.  Yes, the chats.

Q.  And in those chat messages, did you describe some of the events about which you testified today?

A.  Yes.

Q.  Did you describe them at around the time that they were happening?

A.  Yes.

Q.  Did that include your pick up of the $5,000?

A.  Yes.  Yes.

Q.  Did that include you obtaining the $300?

A.  Yes.

Q.  Did that include your calls with Daniel's cousin?

A.  Yes.

Q.  Did it include your call with Daniel about the $5,000?

A.  Yes.

Q.  Did seeing those text messages help you remember some of those events more clearly?

A.  Yes.

MR. LI:  I have no further questions.

MR. LEVITT:  I have nothing further either. Thank you.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  Going off the record. The time is 13:17.  This is the end of Media Card Number 1 -- Number 2, Volume I, and this is the end of the video deposition of Dailyn Hernandez.

(Deposition concluded at 1:18 p.m.)

CERTIFICATE OF SHORTHAND REPORTER

COUNTRY OF SPAIN)

) SS.

CITY OF CASTELLON DE LA PLANA)

I, RACHEL MCROY, Registered Professional Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings and that the transcript is a true and correct transcription of my stenotype notes of the proceedings.

Dated this 14th day of April, 2026.

_____

RACHEL MCROY, RPR

ACKNOWLEDGEMENT OF DEPONENT


    I, _____, do hereby acknowledge that

I have read and examined the foregoing testimony, and

the same is a true, correct and accurate

transcription of the testimony given by me, and any

corrections appear on the attached errata sheet

signed by me.




_____    _____

   (DATE)                    (SIGNATURE)

ERRATA SHEET
CHANGES IN TESTIMONY
UNITED STATES OF AMERICA v DANIEL SIKKEMA
DAILYN HIDALGO HERNANDEZ
April 08, 2026

Page   Line    From                        To

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGNATURE:_____DATE:_____

              DAILYN HIDALGO HERNANDEZ

DAILYN HIDALGO HERNANDEZ
APRIL 08, 2026

JOB NO. 2563037

## $

**$20,000**  83:18

**$3,000**  55:15 56:6

**$300**  27:8 30:24 35:14 52:1 54:9 61:16 84:10 85:6 89:13

**$4,000**  86:12

**$5,000**  55:14,24 56:1, 5 61:16 63:21 64:4 85:8 86:8,13,15,19 89:11,18

**$9,000**  41:19,25 42:4, 8 44:8 47:12 52:3 85:13,20 86:16

## +

**+1**  49:8

**+53**  65:7

## 1

**1**  17:22 22:17 23:20 90:4

**1,950**  44:25

**10,000**  23:23

**10:00**  4:2

**10:03**  5:17

**11**  40:8

**11:27**  45:16,18

**11:50**  45:18,22

**13:17**  90:3

**14**  55:17

**14th**  46:10

**15**  9:14 60:13

**15,000**  23:22

**16th**  51:4 55:20

**17th**  56:2,23 59:21 60:14 61:4 75:19 76:6 77:22

**18th**  69:15 77:22

**1:02**  56:24

**1:03**  40:8

**1:06**  42:12

**1:07**  58:19

**1:10**  59:22

**1:16**  60:15

**1:18**  90:6

**1:32**  61:5

**1:57**  51:4

**1:59**  52:11,16

## 2

**2**  18:1 21:11 24:4 31:14 45:20 46:18 57:12 90:4

**20**  49:13

**2018**  71:1

**2020**  10:16 15:2 69:25 71:2

**2021**  19:5 70:8 72:13

**2022**  71:10

**2023**  11:11 14:1 18:15 24:6 25:17 26:25 35:5 38:19 43:11 49:13 54:9 56:7 71:10 74:6 75:19 76:6 77:22 87:25 88:8, 23

**2024**  10:1 11:7,11 14:2 15:3 40:8 44:1 46:10,24 49:13 51:4 55:20 56:2, 23 59:21 60:14 61:4 67:1 74:7 75:23 76:7 77:22 87:4,25 88:8,24

**2025**  66:25 67:2 87:10

**2026**  4:4 5:16 88:3

**20th**  57:4 75:23 76:7

**21st**  18:15 24:6

**24CR227[ER][ SDNY**  5:2

**24th**  46:15,19,21,22

## 3

**3**  22:18 36:1 61:3

**3,000**  53:21 54:20 55:11,12

**300**  11:22 27:3

**3000**  54:1

**30th**  26:24 35:5

**315**  7:4

**3501-01**  74:18

**353**  65:7

**3:40**  26:25 31:15

**3:41**  32:19 33:2

**3rd**  66:25

## 4

**4**  33:1 36:15,16 42:10 52:15

**4,872**  76:8

**403**  8:6 16:22 73:17

**4872**  76:5

**4:10**  46:10

**4:13**  36:2

**4:32**  34:7

**4:58**  35:5

## 5

**5**  10:7,8,11 34:6 44:13 58:17 65:7

**25,000**  43:3 44:4

**25th**  25:17

**29th**  38:19

**2:06**  54:13

**2:17**  55:20

**2:48**  18:16 21:13

**2:51**  24:6

**5,000**  47:15 54:20 55:10,12 74:9 77:25 78:1

**5000**  11:22 53:19 75:2, 14

**535-353-9218**  17:10

**5:07**  36:17

**5:30**  65:20

## 6

**602**  74:10,12

## 7

**7**  22:18 23:20

**712**  64:7,10 65:5

**712-T**  65:2,6 66:15

**726**  4:22

**7:13**  38:20

## 8

**8**  5:16 59:19

**8,000**  53:21

**8000**  54:21

**805**  7:21 16:20

**851**  13:3,7,22 14:7,19 16:9,23 17:20 18:6

**851-T**  16:12,23 17:2 24:3

**851A-T**  21:19,22

**853**  25:20

**853-T**  25:15,20

**855**  26:16

**855-T**  26:16,20 29:13

**857**  34:25

**857-T**  34:22,25

**858**  21:15 46:6

**858-A**  21:14,15

**864**  38:14

**864-T**  38:14,17

**867**  40:2

**867-T**  40:2,6

**871**  45:23

**871-T**  45:23 46:2,7

**873**  50:24

**873-T**  50:24 51:2
55:18

**874**  56:10

**874-T**  56:10,13,18

**875**  13:4,7,13,23 14:8,
19 16:10 17:20 18:7
60:24

**875-T**  16:13 60:24
61:2 63:9

**8th**  4:4 88:3

---

**9**

**9,000**  43:2 44:22 45:1
51:18 52:4

**9000**  45:5 46:20

**9218**  65:7

**9:10**  25:17

---

**A**

**A-V-A-L-O-S**  5:10

**a.m.**  4:2 5:17 45:18,22
51:4 52:11,16 54:13
55:20

**ability**  5:8

**abundance**  6:19

**access**  10:19 39:12,
24

**account**  39:8

**accounts**  37:23,25
38:4 39:12,23,24 40:1
78:17

**accounts'**  39:5

**accurate**  14:12
64:20 69:5 70:7,10 74:9

**acknowledge**  5:12

**active**  77:19 80:11

**activities**  43:9

**activity**  76:15 77:3

**actual**  7:2

**addition**  7:6 14:22

**additional**  8:6,20

**address**  6:20,21,22
7:2,4 8:17 29:25 35:6,
17 36:8,9,11 37:4,15
47:17,22 48:3

**addressing**  22:10

**administer**  6:1

**admissibility**  8:16

**admission**  7:16

**admitted**  22:15

**affirm**  5:6

**afternoon**  66:6,7

**agency**  57:20,21,24

**agents**  7:8

**ahead**  58:17 61:3

**Ale**  17:15

**Alejandro**  7:18
10:14,15,23,25 11:6,13,
16,23 14:1,13,17,20,23
15:4,7,12 16:6,16 17:8,
17,25 18:16 19:1,12,25
21:3,8,13 22:18,22
23:3,14,20,24 24:7,9,14
25:5,16 26:1,10 27:13,
20 30:11,19,24 32:15
33:2,10,17,19,21 35:4,
8,16 37:22 38:19,20,25
39:10,14 40:9,21 41:5,
17,20 42:3,11,14,17
43:2,5,11 44:3,7,15,16,
21 45:5,6 46:4,9,18
47:1,12 49:1,14,16,18,
23 50:4,10 51:3,21
52:7,8,23,24 55:13
56:23 57:12,16 58:4,7,
8,21 59:2,4,9,12,15,20,

25 60:6,15,19 61:3,9,
18,25 62:2 63:6 65:24
69:23 70:11,25 71:1,4
72:12,19 73:2,5,14,21,
25 74:3 75:11 77:23
78:16 80:19 81:5,20,24
84:13,20,25 85:11,15,
19,22 86:25 87:24 89:3

**Alejandro's**  18:11
22:5 26:22 35:19 51:7
56:21 62:20,23 63:14

**Alexander**  4:15

**aloud**  51:5 56:14

**Amanda**  7:8

**America**  4:9,18 7:5

**amount**  23:21 32:10
84:7 86:14

**amounts**  83:15,20

**Angeles**  7:4

**answers**  8:11

**anticipate**  8:7

**anticipated**  7:23

**AOUSC**  5:10

**Apologies**  13:11

**apologize**  52:15
88:17

**appearing**  6:6

**appears**  64:15 75:10
80:7

**applicable**  7:25

**application**  10:18,
19

**apply**  60:16

**applying**  35:10

**appointment**  67:16

**approaching**  19:14
75:6

**approximately**
11:11,18,20 12:24
18:16 21:13 24:6 25:17
26:25 31:14 33:2 34:7
36:2,17 38:20 40:8
42:12 46:10 49:12,13
51:4 52:11 55:20 56:5,

24 58:19 59:21 60:14
61:5 70:24 71:3 78:2
87:7,24

**April**  4:4 5:16 88:3

**area**  18:23 20:24
41:14 84:4

**areas**  25:9

**argue**  8:8

**arrange**  63:21 64:4

**arrangements**
53:19 54:18 55:3

**arrest**  63:14

**arrive**  46:15,19

**asserted**  16:17

**Assistant**  4:16

**assume**  20:23 76:21

**Assumptions**  21:1

**attachments**  14:4,8

**Attend**  67:16

**attention**  22:6,18
57:10 58:3 83:21,23

**attorney**  4:16 11:8
62:20,24

**audio**  21:12,13,21,24
22:1 46:12

**August**  11:11 14:1
18:15 24:6 25:17 26:24
35:5 43:11 49:13 54:9
56:7 74:6 75:19 76:6
77:22 87:25 88:8,23

**Avalos**  5:9

**avoid**  8:1

---

**B**

**Bachero**  4:19

**back**  18:14 19:21 24:3
26:9 35:21 43:11,13
44:1 46:16 88:20

**bad**  50:23 56:25 57:4,5

**balance**  86:16

**bank** 38:2,4 39:5,8 40:1 78:17

**based** 4:21 25:4 26:4 60:5

**basis** 9:12 12:12 19:8 20:2 23:6 26:5,13 28:18 29:16 39:2 41:7 74:12

**bathroom** 88:16

**began** 71:8

**begin** 7:15 54:12

**beginning** 29:12 35:3 45:19 49:19

**begins** 23:20 51:3

**behalf** 5:20 27:2 30:5, 10,18 84:25

**believed** 7:24

**benefit** 9:1

**bigger** 75:16

**bike** 79:16

**binder** 10:2,6 13:2 17:2 21:19 64:11

**bit** 37:21 75:11

**blank** 68:25 69:6,16, 17

**blocked** 69:19 87:4

**blue** 18:2,3,7 26:22 36:2 46:5 51:6 55:19 56:22

**boarder** 59:18

**Bolinder** 7:9

**border** 57:7 59:18

**borders** 58:10,12,13, 15

**born** 9:19

**bottom** 31:13 32:19 36:16 42:25 44:21

**Brazil** 18:23 19:3,4,6 20:23 22:25 42:15 58:6 59:11 72:12,16 77:23 82:6

**break** 34:23 44:12 45:14

**breaking** 46:11

**broken** 32:22

**brought** 30:14,15

**bus** 25:23

**business** 6:20,21 27:17

**buy** 24:19 25:11

---

### C

**California** 7:5

**call** 8:10 11:8 29:5,7, 20 30:2,16,23 31:7 35:20 36:7 37:3 47:17 53:8,15 54:23 61:8,20, 24 62:1,2,6,11,16,19, 23,24 63:11,14,20,21, 24 64:3 76:18 84:24 89:17

**called** 5:20 27:2 28:13 29:4,13 31:17 34:9,11 35:18,22 36:3 45:7 47:19 48:11 54:6,7,8 60:1 85:16 87:2

**calling** 30:2 34:13 39:3 84:25

**calls** 7:20 14:23 15:6 23:16 60:7 64:4 89:15

**capitalism** 84:3

**capitalist** 84:6

**car** 32:21 40:17

**Card** 45:16,20 90:3

**care** 83:24 84:1

**case** 4:25 5:2 38:8,10 61:6,7

**cash** 31:17 37:17 48:14 55:15

**Castellon** 4:3,6,7,21 7:10

**CASTILLON** 5:15

**caused** 62:10

**caution** 6:19

**cell** 10:20

**center** 33:1 36:1 55:19

**central** 40:14

**certified** 5:10

**Chao** 32:20,22,24 70:21 72:7,22,24 73:2

**chat** 10:18 15:3 17:19, 22,24 18:1 40:6 87:23 89:5

**chats** 7:16 22:10 50:13,17,19,22 89:4

**circumstances** 62:10

**claim** 39:11,15

**clarity** 8:22

**classes** 82:6

**clear** 8:12 73:14

**client** 76:20 88:16

**clients** 21:8

**close** 49:25 76:15

**closely** 13:9

**co-counsel** 4:13 66:9

**Coast** 6:24

**cocounsel** 87:13

**code** 49:7

**comfortable** 19:21

**Commission** 4:22

**committed** 71:8,24

**committing** 6:9

**communicate** 15:4 16:5 48:23 49:5

**communicated** 11:5 86:24

**communication** 64:16 78:10

**communications** 7:17,19 14:17 15:15 24:24 25:4 64:18,21

**completed** 43:17

**completes** 43:8

**computer** 77:16

**conceding** 8:16

**concerns** 8:7

**concluded** 90:6

**condensed** 41:14

**conducting** 7:7

**conference** 66:24

**conferences** 68:11

**confirm** 35:20

**confirmed** 31:15,20 32:17

**confirming** 31:18 32:8,9 33:4,13

**confusing** 72:3

**connected** 80:8

**connection** 48:18 52:1 54:9

**considered** 71:19 78:2

**constant** 60:22

**construed** 8:15

**contact** 33:20 48:25 49:2 87:9

**contemporaneous** 8:13

**contemporaneously** 9:12

**contents** 7:19

**context** 58:14 65:21

**continue** 12:14 24:11 31:12 32:3 35:3 52:9 54:11 76:23 77:21

**continued** 73:5

**continues** 39:13

**continuing** 7:15 19:15 58:24

**controls** 80:10

**convenience** 28:23

**conversation** 15:18 28:25 29:2,24 59:7 69:14

**conversations** 16:1 67:5 81:5

**convinced** 57:6

**Cooperation** 4:20

**copies** 16:11

**copy** 17:3

**correct** 66:21 68:15, 20 69:23 71:13 72:9,13, 17,22,25 73:16,22,25 74:4 76:8 77:23 78:7, 17,21 81:7,25 82:9,19 83:6 85:9,17,24 86:6,9, 17,18

**correction** 11:25 34:1

**correctly** 30:22 31:6

**correspond** 50:22

**corresponds** 49:10

**countries** 49:9

**country** 9:19,23 18:24 19:1 36:13 45:12 48:6 49:7,9

**couple** 44:11

**court** 4:7 5:1 6:15,17

**cousin** 28:21,24,25 29:18,24 30:23 31:7,8, 19,22 32:5,13 33:12 34:8,10,12,13,14 35:24 47:25 53:18 54:5,17,20 55:2,5,10 89:15

**cover** 76:8

**coyotes** 58:22 59:16

**crime** 6:9

**Criminal** 9:13

**cross** 59:18

**cross- examination** 8:9 87:20

**crossing** 58:10 59:17

**Cuba** 9:20 15:1 18:25 34:4 36:14 37:5 44:22 45:1,5,13 48:7 55:9 58:1,10 72:20 79:3

80:19 81:13,14 84:22 85:24

**currency** 37:19 48:16

**curser** 77:14

**D**

**Dailyn** 4:5 5:19 6:5 9:18 45:17,21 65:21 90:5

**Damn** 52:18

**dangerous** 40:15 41:15

**Daniel** 4:9,14 7:24 12:8,11,15,20,25 27:3 28:10,11,17 29:8,14 30:14,15,25 31:8,18 32:8 33:5,6,13,14,17 34:15,17 48:18,23 49:4, 14,16,18,21,22,24 50:1, 3,4,11,13,17 51:12,13, 14,22,25 53:2,4,8,14 54:3,23 55:5 56:8 58:20,21 59:2,6 60:1,6 61:10,11,15 62:1,3,6, 11,16,24 63:12 64:5 65:17,20,22 66:9 81:6, 11,19 85:23 86:3,5 89:17

**Daniel's** 12:9 32:6 34:12 35:24 47:25 49:2 54:5 61:6 89:15

**Daniels** 49:23

**date** 4:4 56:3 66:15 75:16,17 87:1 88:2

**dated** 18:15 24:5 26:24 38:19 40:7 51:3 55:19 59:21 60:14

**dates** 11:19 66:23

**David** 80:2

**day** 19:12 24:11 44:25 74:4

**de** 4:3,6,7 5:15 7:10 40:23

**deal** 83:9

**December** 38:19 69:25

**decide** 62:24

**defendant** 80:7

**defense** 7:12

**delete** 50:15,17,18

**deleting** 50:21

**deliver** 30:4 57:3

**delivered** 27:25 28:2

**delivering** 34:3

**deposition** 4:5 6:14 7:7 8:14 10:3 22:13 45:17,20 90:5,6

**describe** 30:2 89:5,8

**describing** 29:21 54:23

**detail** 88:14

**details** 88:7

**Dey** 5:22,24

**die** 78:20

**differently** 88:10

**direct** 22:6,17 69:22 72:11 78:15 84:16

**directing** 57:10 58:3

**directions** 29:1

**directly** 11:13 61:8 86:24

**disconnected** 77:9

**discuss** 13:18 63:14

**discussed** 50:4

**discussing** 44:15 59:3,6

**District** 4:17 5:1

**document** 67:17 75:7,9

**dollars** 37:20 48:17

**doorman** 82:15,16

**doors** 8:15

**dreams** 24:12,15 25:3,12 47:8

**E**

**e-mail** 38:2,4 39:4,7

**earlier** 17:19 19:21 23:1 30:14 35:23 41:2 44:7 47:25 55:14,24 63:21 64:3

**early** 11:11

**easier** 19:17

**East** 6:24

**easy** 24:20

**electrical** 82:11,14

**electronic** 14:4

**electronically** 17:3

**elicit** 8:8

**employees** 7:9

**empty** 39:12,25

**end** 45:16 90:3,4

**engaging** 77:25

**English** 5:7,8 16:11 65:3

**entire** 75:9

**entitled** 67:21

**events** 86:12 88:4,7 89:6,21

**eventually** 86:8

**evidence** 7:22 22:11 89:1,2

**evidentiary** 7:25

**exact** 11:19 43:19 56:3 86:14

**examination** 9:15 66:4 69:22 72:11 78:15 84:16 87:17

**exceptions** 16:20

**excerpt** 35:4 51:3

**excerpts** 14:12

**exchange** 44:16 51:21 52:23 59:3

DAILYN HIDALGO HERNANDEZ
APRIL 08, 2026

JOB NO. 2563037

**exchanged** 44:24 71:7,12

**exchanges** 44:25

**exchanging** 86:20

**excludable** 16:21

**excursion** 20:10,19 22:24 23:8 24:1 26:15 41:1,3,23 42:2,21 43:8, 11,12 44:6 45:10 47:3 52:6 81:10,15 83:11

**excursions** 22:25

**excuse** 4:8 6:23 7:1 12:9

**exhibit** 8:5 10:6,7,8, 11 16:23 17:2,4,20 21:14,15,19,22 24:3 25:15,20 26:16,20 29:13 34:22,25 35:10 38:14,17 40:2,6 45:23 46:2,3 50:24 51:2 55:18 56:10,13 60:13,24 61:2 63:9 64:7,10 65:2 66:14,15

**exhibits** 8:3 10:3,4 13:2,3,4,15,21,22 14:7, 19 16:9,12,15 18:6,11 21:11 22:9,13,14

**existed** 84:5

**expect** 10:3 66:23 85:19

**expecting** 29:5

**explain** 20:19 30:5,15 38:3 42:3,7 44:8 62:2

**explained** 30:23

**express** 8:19 73:6

**expressed** 78:23

**extend** 31:25

**extent** 8:17

**F**

**fact** 53:4 56:1 62:5 72:19 74:6 78:5 82:25 84:6 86:8 87:4

**fair** 68:24 74:7 77:17

78:10 88:4

**false** 6:9

**familiar** 13:10 34:2

**familiarity** 25:9

**family** 11:24 12:1 24:13 28:5,13,17 31:2

**favela** 42:14

**favelas** 40:13 41:6, 10,15 83:10,12

**favor** 36:20,21

**FBI** 7:8

**February** 53:20 54:1, 19,21 55:8,11

**Federal** 7:21 9:13

**federally** 5:10

**feed** 76:24

**female** 70:6 82:12

**file** 21:12,13,21 22:2

**final** 64:9

**find** 7:1

**finding** 40:12

**fingers** 75:12,13

**finish** 41:18

**finishes** 85:12

**firstly** 5:3

**Fiscal** 7:10

**Fiscalía** 4:6

**flip** 13:10 55:17

**flipping** 13:5

**Florian** 4:13 66:9

**focus** 11:10

**follow-up** 66:3

**forget** 69:11,20

**form** 62:12,17 69:7 73:17

**foundation** 7:22

**friend** 11:24 12:2 28:5,6 31:4 36:20,23,25 37:5,8,10,12,14 49:20,

21 58:23 70:6 73:9 81:11,20 82:12 84:17, 21 85:4

**friends** 12:6 73:9

**friendship** 10:24 11:4

**front** 10:2 21:11 63:8 64:10

**fulfilled** 43:18

**full** 12:16 74:21,24

**fully** 80:7

**G**

**Garcia** 12:15 27:3 29:14 30:15,16,25 31:8

**gardening** 83:3

**gave** 27:5,21 29:18 33:6 37:4,14,22 38:3 47:22 48:10 49:1

**gears** 37:21

**girl** 34:9 35:18,22 36:5 37:3 44:18 47:20,23 48:11 57:3,18,20,23

**give** 30:24 31:17 35:6, 17 37:12 42:3 51:13,15 52:14 53:19,20 54:1,20 55:10,11 65:23 67:14, 15

**giving** 30:5 32:10 38:1 44:8 82:6

**Goldi** 17:5,9

**good** 4:1,12,15 5:22 46:12 56:24 57:2 66:6,7

**government** 8:8,17 10:6 13:3,22 14:7,19 16:9,12 17:1,20 18:6 19:18 21:14,19 24:3 25:14 26:19 29:13 34:21 40:5 46:1 51:2 55:18 56:13 61:2 63:8 64:10 65:1 66:15,21,25 67:5,10,11,20 68:2,3,5, 11,13 69:15 74:18 81:18

**government's** 9:11

10:10 38:17

**government-in** 81:17

**grandfather's** 32:21

**grandparents** 40:12 86:21

**great** 58:22 83:9

**green** 17:23,24 18:11 26:23 46:4 51:7 56:22 57:11 65:15,16

**grounds** 7:20 8:6

**group** 10:16 15:3 83:9

**grow** 9:21

**guest** 82:17

**guide** 20:21,22

**guided** 19:17

**guy** 61:11

**H**

**habit** 50:23

**half** 88:5,12

**handful** 87:19

**happen** 40:15 44:9

**happened** 41:2 51:9 59:25 88:12

**happening** 40:16 89:9

**happy** 8:19 24:8 72:4

**hard** 25:25 26:10,12

**he'll** 54:17,20 55:2,11 61:8

**head** 46:15

**health** 68:20 69:21

**hear** 9:1,7 61:7,20,24, 25 76:21

**heard** 4:25 22:2

**hearsay** 7:20,21 8:9, 10,16 16:15,16,17,19 18:20 20:12,25 23:16 26:13 27:23 29:16 30:8

33:8 38:5 41:8 43:21 45:3,7 46:13 53:22,23 58:25 64:22

**helped** 61:16

**helps** 53:12

**Hernandez** 4:5 5:19 6:6 9:18 45:17,21 66:6 87:15 90:5

**Hey** 51:8

**Hidalgo** 4:5 5:19 6:5 9:18

**Hill** 6:16

**hit** 76:16

**home** 46:16

**honest** 63:18 84:7

**hope** 40:11 41:18

**hour** 34:22

**house** 24:12,15,19 25:2,11 46:17 47:5,6,8, 10 72:20 79:18,21 80:21 81:1 86:21

**houses** 20:5 41:13

**husband** 70:20

**husband's** 32:23

---

**I**

**idea** 60:22 61:12

**identification** 10:8 13:3 16:12,24 21:16,23 25:21 26:17 35:1 38:15 40:3 45:24 50:25 56:11 60:25 64:7

**identified** 34:11 48:1 74:18 75:7

**identify** 29:7 30:17

**identifying** 78:16

**illegally** 58:15,16

**important** 50:20

**impose** 16:14

**impression** 86:5

**in-person** 15:6

**inadmissible** 8:9

**include** 14:4 16:15 64:18 89:11,13,15,17

**including** 22:9

**indirectly** 11:13

**individuals** 7:7 12:5 59:17

**information** 48:25 49:2 50:19

**informed** 15:14

**initially** 85:11

**inside** 83:11

**intended** 6:1

**intense** 78:3,9,11

**interested** 39:21

**International** 4:20 5:23

**interpose** 16:14 22:7,8

**interpreter** 5:9,11 11:25 21:5 34:1 41:11 69:1,2 70:13,16 71:18 76:13,14 79:8,9,24 80:3

**interpreters** 5:4

**interpreting** 79:9

**interrupt** 75:6 76:11, 19

**interruption** 8:1

**interviews** 81:17

**introduce** 4:10

**introduced** 70:3

**investing** 19:13 20:1

**irrelevant** 16:21

**issues** 8:18 57:14 69:21

---

**J**

**jail** 11:9 62:20

**Janeiro** 40:23

**January** 14:2 15:3 40:8 44:1 46:10,23,24 49:13 51:4 55:20 56:2, 23 59:21 60:14 61:4 69:15 74:6 75:23 76:7 77:22 87:25 88:8,24

**job** 41:18,20 85:12

**jobs** 20:10

**Jose** 70:12,13,17,21, 22 71:4,21 72:6 73:15, 21

**judge** 8:23,25

**July** 66:25

**jump** 42:10 58:17 61:3

**jumping** 57:8 58:8,9, 12

**Justice** 4:22

---

**K**

**killing** 78:23

**kind** 11:1,3 20:19 86:6

**kinds** 38:24

**knew** 20:9 24:17 39:20 73:21 79:1

**knowing** 74:2

**knowledge** 12:12 19:9 20:3 23:6 26:5,14 28:19 29:17 39:2 41:7 74:12

---

**L**

**la** 4:3,7 5:15

**lack** 7:22

**lady** 27:2

**language** 16:5

**law** 67:12

**lawyer** 9:3 39:11 67:21,25 68:1,5,6,10,14 87:2

**lawyers** 8:24 9:1

**leading** 25:6 54:24 63:15,25

**learn** 43:24

**learned** 81:19

**leave** 43:20 57:6 58:11

**leaving** 57:8 58:4

**left** 18:2,3,8 24:10 26:22 31:12 46:5 52:17 65:13

**legal** 57:7

**legally** 58:14

**letting** 11:8

**Levitt** 4:12,13 7:14 9:6 12:12,17 16:14 18:19 19:8,15,23 20:2, 12,25 22:7 23:6,11,16, 25 24:16 25:6,19 26:4, 13 27:1,22 28:12,18 29:16 30:8,20 31:9,23 33:8,22 34:18 35:9 38:5,11 39:1,16 40:18 41:7,22 42:19 43:21 45:3,7 46:6,13 50:7 51:19 53:1,22 54:24 56:16,19 58:24 60:3,7 61:21 62:12,17,25 63:15,23 64:22 66:1,5,8 67:24 68:9,18,23 69:3, 4,9 70:15,18 71:20 73:20 74:14,19,23 75:1, 4 76:21 77:2,7,10,15, 17,20 79:5,7,11,20 80:1,4,13,17,24 81:4 87:12,15 89:24

**Li** 4:15,16 5:25 6:19 7:3 8:22 9:9,16 10:9 12:3, 13,19 13:17,20 16:25 18:21 19:11,19,24 20:6, 15 21:2,7,17,25 22:12, 16 23:9,13,18 24:2,22 25:13,22 26:8,18 27:4 28:1,15,22 29:19 30:9, 21 31:11 32:2 33:9 34:5,20 35:2,13 38:9,16 39:6,22 40:4,20 41:16, 24 42:22 43:23 45:4,11, 25 46:7,8,14 50:9 51:1, 20 53:3,24 55:1 56:12,

18,20 59:1 60:4,11 61:1,23 62:14,22 63:3, 19 64:1,8,23 65:25 67:22 68:7,16,21 69:7 73:17 74:10,12,21,24 75:3 76:11,16,19 77:1, 4,8,13,16,18 79:4,6,14 80:5,12,22 81:2 87:18 88:17,21 89:23

**life** 23:22 82:2

**Likewise** 66:13

**lines** 22:18 38:23

**link** 9:8

**listed** 17:5,15

**live** 9:23 72:24

**lived** 43:13 84:5

**lives** 82:2

**living** 18:24 19:2,6 45:12

**local** 4:2,7 6:2 45:22

**located** 49:16,18

**location** 6:25 26:1 55:8

**long** 17:9 40:11

**long-running** 73:24

**looked** 83:22

**Los** 7:4

**lot** 15:5 22:21 38:7

**lots** 70:17

**love** 73:6

**Lucia** 4:19

### M

**made** 18:20 37:3 71:14,16 73:14

**make** 6:8 8:12 20:4,8 30:22 31:6,23,24 53:19 54:18 55:3 75:16 76:20

**makes** 80:10

**making** 83:14

**man** 70:11

**marked** 10:8 13:3 16:12,23 21:14,15,22 25:20 26:16 34:25 38:14 40:2 45:23 50:24 56:10 60:24 64:7

**married** 71:17,22

**Marta** 40:14

**matter** 4:8,18 8:3 16:17

**Mcroy** 6:16

**means** 29:3

**media** 10:18 45:16,20 90:3

**medication** 86:21

**meet** 14:25 48:18,21 66:12 70:24 72:22

**meeting** 68:1

**meetings** 15:7 67:19

**member** 11:24 12:1 28:5,13,17 31:2

**memory** 87:20

**mental** 69:21

**mentioned** 20:24 43:10 79:16

**mentioning** 26:7

**Mercedes** 5:9

**message** 18:2,10,15 19:12 21:12 24:5,7,8 25:3 26:2,10,24 29:2,12 31:14 33:4,19 35:19 36:2,16 38:18,20,22 39:10 40:7 41:17 42:10, 13,25 44:2,13,20 46:9 51:3 52:10,16 53:10 54:12,15,23 55:19 56:6, 23 57:10,11,19 58:21 59:20,21,22,23,24 60:5, 13 61:19 63:7,8 65:18 75:17,22 76:12

**messages** 7:16 13:25 14:5,12,16,18,20, 22 15:6,12,13,14,17 16:9 17:19,23,24 18:5, 7,11 20:17 24:4 25:15, 18 26:21,22,23 27:9

33:3 35:4,6 40:6 46:3,4, 5 51:5,6,7 56:14,21,22 58:3,7,18,19 61:4,5,10 65:12,13,15,16,19 74:7, 9,15 75:10,18 76:8 78:12 87:23 88:23 89:3, 5,20

**messenger** 86:23 87:10

**met** 10:16 12:20 15:2 49:24 66:10 68:2 69:23 70:8,11,25 71:1,4

**Meyer** 7:9

**middle** 52:10,15 54:13

**Miedel** 4:14 66:9 88:15

**Miguel** 70:12,14,21, 22 71:4,21 72:6 73:15, 22

**Miguels** 70:17

**mind** 13:5 69:6,16,17 82:1 84:8

**mine** 17:11 31:3,4 36:20 39:18 58:23 65:11 70:6

**Ministry** 4:22

**minute** 88:15

**misleading** 6:8

**moment** 18:6 29:21 75:15 87:12 88:18

**money** 11:12,15,20, 23 20:4,8 22:20 23:4, 21,23 24:1 27:10,15,18 28:3,8 29:25 30:4,6,17, 18 31:2 32:10,18,25 33:14,16 34:3 35:7,11 36:10,18,22,23 37:8,10, 12,14,17 44:5,9,18 46:20 47:9,16,21 48:4, 8,10,14 51:24 55:13,23 56:7 59:4 60:17 65:23 81:6,8,12,21 83:9,15 84:18,21 85:1,15,23 86:20

**moneys** 81:9

**month** 46:22 57:4

**months** 78:2

**morning** 4:1,12,15 5:22

**mother** 78:24

**move** 9:25 16:4 19:4

**moved** 72:12,16 77:14

**multiple** 49:23 50:5 74:3

**municipality** 79:22 81:1

### N

**nail** 27:17 84:14

**named** 70:11 81:11

**names** 12:4,11

**nature** 10:22

**needed** 27:19

**nervous** 69:18

**news** 46:11 56:24,25 57:2,4

**nice** 54:14 66:12

**night** 79:19

**Ninth** 7:4

**nonetheless** 73:5, 11

**normal** 86:6

**note** 4:25 7:6 9:6 22:12 80:6

**notes** 14:5

**Nuevo** 79:23 80:4 81:1

**number** 5:2 13:6,12 17:9,10,13 45:16,20 49:1,4 56:16 61:6 64:14 65:7,10 76:1,2,4 78:12 87:5 90:3,4

**numbers** 78:16

DAILYN HIDALGO HERNANDEZ
APRIL 08, 2026

JOB NO. 2563037

## O

**oath** 6:1

**object** 12:12 62:12, 17,25 63:24

**objecting** 19:16

**objection** 7:16,25 8:2 9:2 12:17 16:15 18:19 19:8,16,20,22 20:2,12,25 22:8 23:6, 11,16 24:16 25:6 26:4, 13 27:22 28:12,18 29:16 30:8 31:24 33:8, 22 34:18 38:11 41:7 43:21 45:3,7 46:13 50:7 53:22 54:24 58:24 60:3, 7 63:15,23 64:22 67:22 68:7,16,21 69:7 73:17 74:10,11 79:4,5,14 80:5,22 81:2

**objections** 7:13 8:5, 14,20,24 9:9,11 18:20 19:23 23:25 25:19 27:1 28:12 30:20 31:9,25 35:9 38:5 39:1,16 40:18 41:22 42:19 51:19 53:1 56:19 61:22

**objects** 9:4

**observe** 9:7

**obsessed** 73:12

**obtaining** 89:13

**occasionally** 78:6

**occasions** 11:21 66:21 67:6,7 68:2 83:20

**occur** 29:2

**October** 87:10

**Off-the-record** 87:14 88:19

**offer** 68:5,13

**offered** 16:17 22:13, 14,15

**office** 6:24 88:25

**ongoing** 77:10

**online** 37:23,25 82:22,24

**open** 10:6 77:6,9

**opening** 8:15

**opportunity** 13:17

**option** 60:2,6

**order** 20:5

**ordered** 67:15

**organized** 82:12

**original** 16:10 65:2

**out-of-court** 7:17 31:25

**owe** 23:4

**owed** 81:6,12,21

**owned** 81:8

## P

**p.m.** 18:16 21:13 24:6 25:17 26:25 31:15 32:19 33:2 34:7 36:2,17 38:20 40:8 42:12 46:10 56:24 58:19 59:22 60:15 61:5 65:20 90:6

**package** 57:20,24

**pages** 56:14 65:6 74:9 75:2,14 76:8 78:1

**paid** 33:6 44:5 52:5,8 81:9 83:8,21 84:8

**paper** 67:14 71:23 74:8

**part** 25:4,25 26:10,12 40:14

**participant** 17:15

**participants** 17:5, 18

**particularize** 8:4

**parties** 4:10 9:10 82:12

**Partly** 58:21

**parts** 42:15

**party** 82:16

**passcodes** 78:17

**passed** 78:24

**passive** 4:21 6:4

**passwords** 37:22 38:1,3,22,24 39:5,8

**past** 65:6

**pause** 27:6 31:21 51:18 52:22 54:22 57:9 58:23 88:15,18

**pay** 22:19 23:4 27:18 42:16 43:2 45:1 60:17 82:1 83:23

**payment** 42:2 44:23 54:9

**penalty** 5:13

**people** 16:18 42:20 44:14 50:6,22 55:4 58:11 59:17

**period** 11:10,12 49:12 77:21 78:1

**perjury** 5:14

**persist** 73:11

**person** 10:10 12:20 14:25 23:7,10 28:8 29:7 33:25 34:3,11 35:23 45:9 47:24 48:18,21 50:5 51:23 54:6,7,8 61:16 65:23 70:8

**personally** 48:8

**persons** 23:8,10

**Phillip** 6:16

**phone** 7:20 10:20 12:22,25 17:13 29:20 30:16,23 31:7 36:6 49:4 53:6 57:2,13,14,23 64:14 65:7,10 86:6

**photos** 14:5

**phrase** 25:2,4

**phrases** 14:16

**pick** 35:7 36:10,22,23 37:8 40:6 47:18,21 48:3 55:21,22 56:1,3 64:4 85:1,4 89:11

**picked** 30:1 32:11 36:18

**pickup** 63:22

**piece** 67:14

**place** 4:6 7:12,15 84:4

**Plaintiff** 5:20

**plan** 20:11 60:20

**Plana** 4:3,7 5:15

**planned** 43:9,19

**play** 21:21 57:23

**playing** 21:24

**poems** 82:21,23

**point** 71:7 78:20 83:17 84:12 86:2,11 87:4

**possession** 24:12

**possibly** 6:9

**practice** 50:21

**preparation** 88:22

**preparing** 14:8

**present** 5:24 7:8

**presented** 60:2,6 61:12

**presently** 22:9

**prevent** 40:16

**Preves** 7:18 10:14

**Prevez** 14:1

**previous** 35:9

**previously** 18:20 47:8 66:18

**printed** 74:8 76:7,8

**printout** 74:15,19,24 75:1,3

**prior** 47:20,23

**problem** 7:3

**problems** 68:20 69:19

**Procedure** 9:13

**proceedings** 6:2 9:8

**proffer** 8:5

DAILYN HIDALGO HERNANDEZ
APRIL 08, 2026

JOB NO. 2563037

progressing 24:9

project 10:4

promised 47:12

prosecutor 4:20 6:1

prosecutor's 5:23
88:25

provided 74:17

providing 38:25
78:16

Provincial 4:6 7:10

purchase 20:5 47:10
84:14

pursuant 9:13

put 8:20

**Q**

question 8:5 9:4,5
15:11,16 19:16 21:6
29:11 32:4 43:1 44:14
62:9,13,18 69:1 72:2
80:16 88:11

questions 8:10,14
13:15 14:15 44:11 64:9
66:1,2,3 87:16,19 89:23

quick 41:18 46:11

quickly 46:12

**R**

Rachel 6:16

raises 8:6

reach 51:13 57:7

read 25:2,18 26:21,22
35:6 46:2,3,5 51:5,6,7,
21 52:23 53:11 56:14,
21,22 59:23 61:5 75:8,
14 76:1

reading 15:12 31:13
52:9 54:11 59:23 65:7

reads 17:9 24:8 46:11
58:19

ready 18:17

reason 42:6 43:19

reasons 40:17

recall 12:24 29:23
36:6,11,13 37:25 48:3,
12 49:4,7 50:10 53:8,17
56:3 63:11 64:2 67:17
84:12 87:1,21,25

receive 11:12,15,20
41:19 47:14 55:15 56:7
85:13,16

received 6:4 11:8
47:11,17 55:14 56:5,6
62:19,23 84:10,24 85:6,
15 86:8,13,15,16

receiving 83:18 85:8

recess 45:18

recognize 10:10
13:21 17:10 22:1,4
64:11 65:10

recollection 72:12
79:21 80:25

record 4:2,11 5:11
6:4,21 7:12,15 8:21,23
9:6,13 45:15,21 90:2

recording 21:21

recordings 22:11

recounting 7:19

redacted 38:23

refer 15:18 19:21
28:23 29:13 51:21 71:8
72:6

reference 52:3

referred 15:23 53:25
54:4

referring 16:1 22:23
23:3,7,24 24:14,24
26:2,11 27:8,12,20 28:7
31:21 32:4,7,12 33:17
34:8,10 35:8,16,21
36:3,18,21 38:13 39:24
40:22 41:21 42:1,17
45:6 47:5,7,24 50:5
52:7,24 54:5,8 55:4,8,
12,22 57:12 58:14 61:9
63:5,7 70:22 89:2

refers 16:18 26:10
28:4 57:18 58:4,7

regard 22:8

region 20:23

related 7:18,20 8:3

relationship 10:22
11:1 25:9 28:16 71:9,25
73:16,24

release 44:25

relevance 8:6 26:4
27:22 38:11 39:2 40:19
62:25 67:22 68:7,16,21

remain 80:7

remained 72:15

remaining 44:9

remember 11:19
38:21 53:9,12,14 63:16,
17,24 66:23,24 67:8
69:13,20 81:16,18 82:6,
12 84:9 85:13 86:12,14
87:7 88:8,12 89:20

repair 79:16

repeat 18:19 29:9
39:1 62:9 80:15

repeated 21:6 69:2

repeating 35:9 51:19
53:1 61:21 79:9

rephrase 12:10
65:18 72:4

reply 78:5

reporter 5:6,12,21
6:15 74:11

Reporting 6:17

represent 4:14,17
66:9

representative
69:14

representatives
66:20

represented 67:21

representing 6:17

represents 66:18

request 4:21 6:4

requestor 4:23

required 6:7 8:24
67:11,12

requires 19:20

reserved 9:10

reserving 8:18

residency 60:17

respect 9:9 22:17

responded 32:16

responds 24:7 33:3

response 24:8 33:3,
11 35:19 42:12,13 43:1
44:13 58:20 59:22,24

rest 45:1

return 37:10

review 8:25 13:8,9
88:23

reviewed 13:22 14:7,
18 17:19 18:5

Richard 4:13 66:8

rights 8:18 9:10

ring 71:10

rings 71:7,12

Rio 18:17,22 20:24
23:14 25:23 26:6 40:10,
14,22,23,24

role 57:22

room 10:5

rule 7:21 9:13 16:20,
22 19:19

Rules 7:22

rulings 8:13

running 73:15

**S**

safe 24:13 38:22 61:6

safety 40:17

salon 27:17 84:14

Sanchez 4:19 6:3,13
13:14 76:17 80:9 88:20

DAILYN HIDALGO HERNANDEZ
APRIL 08, 2026

JOB NO. 2563037

**Santa** 40:13

**save** 50:18

**schedule** 43:18

**Scope** 79:4,6,14 80:5, 22 81:2

**screen** 10:5 17:4

**screenshot** 64:15, 20 65:3,4,8,21

**scroll** 75:11

**security** 79:12,17,18 80:21

**sell** 82:24

**selling** 82:21

**send** 15:12,17 27:10, 11,15 31:2,3,4 32:20 57:15,25 58:18 59:5 81:11 84:22 85:25 86:16

**sending** 51:23 84:17, 21 85:23,24

**sends** 35:4 61:4

**sense** 10:25

**sentence** 23:19 34:14 55:4,6

**series** 13:2

**Service** 6:17

**set** 41:13

**Sharmila** 5:24

**sheer** 78:11

**shipping** 57:20,24

**shop** 79:17

**show** 10:3 16:8 74:17 75:7

**showed** 66:14

**showing** 21:4

**shown** 10:10 13:15 38:18 46:3 64:11 76:9 87:23

**side** 5:23 60:23

**Sikkema** 4:9,14 7:24 9:7 66:9,18 76:25

**simply** 62:15

**single** 50:5

**sir** 6:23 7:1

**sit** 68:10

**skip** 36:1

**slums** 41:12

**small** 41:13

**social** 10:18

**somebody's** 80:21

**sort** 20:10 25:8,12 39:19 50:19 69:21

**sound** 67:7

**sounded** 86:5

**Southern** 4:17 5:1

**Spain** 4:3 5:15 9:24, 25 15:23,25 16:2 24:18 25:8,10 45:22 47:9 60:18,23

**Spanish** 5:7,10,23,25 16:7,10 65:3 76:12 82:6

**speak** 49:14 52:19 53:4,18 68:1

**speaker's** 22:1

**speaking** 12:25

**special** 7:8

**specific** 8:5 41:14

**specifics** 68:19

**speculation** 34:18 39:3 43:22 45:8 60:8

**spelled** 79:25

**spoke** 7:23 49:20 79:2 86:2,22

**spoken** 12:22 66:17, 20

**stamped** 65:20

**standing** 8:2

**start** 6:13 19:13 20:1 26:23 27:16 31:13 52:10 57:8 64:2

**started** 7:11 9:14 17:1

**starting** 35:5 61:4

**starts** 25:16

**state** 6:3,7,20 8:24 9:17

**stated** 9:12 31:7

**statement** 6:8

**statements** 31:25

**States** 4:8,16,18,23 5:1 6:5 7:5 49:11,21 57:9 58:5 59:14 60:10, 16,21 61:13 81:19 84:17

**station** 25:24

**staying** 46:17

**stays** 76:20

**Steno** 6:17,24

**Steno's** 6:21

**step** 87:13

**stop** 75:15

**Street** 7:4

**subject** 8:3

**substance** 63:11

**successful** 43:12, 16

**suicide** 78:20

**summons** 67:18

**supplement** 8:4

**support** 59:23

**supposed** 29:25

**surgery** 71:11

**swear** 5:6

**switch** 37:21

**sworn** 5:4,5,21 6:10

---

**T**

**table** 84:14

**taking** 4:6

**talk** 43:10 49:23 52:20, 23 54:17 55:2 78:9

83:20 84:6

**talked** 15:25 79:15

**talking** 32:24 35:14 39:20 54:1 55:13 57:5 58:10 60:1 80:18 88:4

**taxes** 27:18

**tech** 76:18

**telephone** 72:16

**telling** 24:18 32:15 33:10,21 43:5 44:3 46:18 47:1 57:5 60:19 61:18 81:16,18 82:3 83:13

**tells** 34:13 52:18

**term** 58:12

**testified** 44:7 55:14 69:22 72:11 85:8 89:6

**testifies** 5:21

**testify** 67:11,12

**testifying** 22:10

**testimony** 5:13 6:10 7:18,23 8:8,21 14:9 67:15 77:10 84:9 88:22

**text** 7:16 29:2 51:10 63:7 74:3 88:23 89:3,20

**texted** 63:1,4

**texts** 78:1,5,6

**thing** 5:24 15:20 34:12 39:4,19 42:14 47:7 75:12

**things** 16:18 25:12 39:11,15 43:24 69:11 78:13 80:20 81:24 84:2, 3,5 86:21

**thinking** 82:4

**thought** 26:5 78:20

**thoughts** 78:23

**time** 4:2 7:2 9:2 11:5, 7,10,12,22 15:9 18:24 19:1,7 20:7,16 21:18 22:14,15 37:6,22 40:25 43:8 44:14,19 45:12,16, 21,22 47:11,20,24 48:8 49:12 61:7 62:5 65:20

66:1 68:13,14 71:12 77:5 79:1,19 84:12 86:2,11,22,24 89:8 90:3

**time-out** 80:6

**times** 11:15,17 12:24 15:22 67:9 69:5 74:3 79:10 83:14

**today** 8:23 10:4 14:9 57:2 59:7 88:22 89:6

**today's** 4:4 6:15 88:2

**told** 24:10 28:9,11,20 35:20 36:6 39:9 43:25 44:22 49:19,21 52:23 53:14 67:4,12 73:8 78:19 79:12 80:19,20 81:20,24 82:5,11,21 83:2,8,17 84:13,16 85:16,19

**tomorrow** 46:16 54:17 55:3,21

**top** 17:4 26:24 34:6 42:11 44:13 58:18 59:19

**total** 43:3 44:4 54:21

**totalling** 53:21

**totally** 57:7

**touch** 72:15

**tour** 20:21,22 22:20,23

**tourist** 42:14

**tourists** 42:18 83:9, 19

**tours** 21:4,9 23:15 40:13

**town** 4:3,7

**transaction** 48:19

**transcript** 21:20

**translate** 5:7

**translated** 16:11

**translation** 21:20 65:3

**translations** 16:11

**translator** 5:22

**traveling** 15:23,25

**treated** 8:2

**trial** 22:15

**Triana** 10:14 14:1

**trip** 40:10

**true** 5:13 14:11 64:20 69:10 81:23,24,25 82:8, 9,18,25 83:5

**trusted** 38:7

**truth** 6:7,11 16:17

**truthful** 83:24

**turn** 17:2 18:1,14 21:11,18 24:3,4 25:14 26:9,19 33:1 34:6,21 36:15 40:5 44:1,12 46:1 51:2 56:13 60:12 64:10 65:1

**types** 37:25 50:19 78:13

## U

**U.S.** 37:20 48:17

**ugly** 42:15

**Uh-huh** 67:19 69:22 70:7 71:12 72:19 73:5 74:2 76:10 79:12 81:16 83:2 84:9,12

**understand** 6:10 15:7,10,16 16:3 18:22 19:25 23:3,23 24:14 26:1 27:20 30:22 32:15 33:10,21 35:7,16 38:24 39:14,23 40:21 41:5,20 42:17 43:5 44:3 45:6 46:18 47:1,5 52:24 58:8 59:9,12,15 60:19 61:9, 18 72:3

**understanding** 8:4 9:10 15:13,14,20 22:22 25:3 26:11 27:14 28:16 57:22 60:5 77:23 84:20 85:22

**understands** 9:5 33:23

**understood** 31:6 41:25

**Union** 44:24

**United** 4:8,16,17,23 5:1 6:5 7:5 49:11,20 57:8 58:5 59:14 60:10, 16,21 61:13 81:19 84:17

**unnecessarily** 8:1

**unpleasant** 40:15

**untrue** 6:8

**USD** 27:3 43:3 44:4

**UTC** 18:16 24:6 25:17 26:25 35:5 36:17 38:20 40:8 46:10 51:4 52:11 55:20 56:24 58:19 59:22 60:15 61:5

## V

**Vedado** 79:22,23 80:1 81:1

**versions** 16:8

**versus** 4:9

**Victor** 80:1

**video** 4:5 9:8 45:17,20 66:24 90:5

**view** 9:11

**views** 8:19

**voice** 14:5 22:1,4 29:3

**Volume** 45:16,20 90:4

## W

**wanted** 7:12 10:25 20:4 24:18 25:8,11 27:10,11,14,16,17 38:7 39:18 42:6 57:15 68:6 73:8 82:24

**warning** 80:6

**Webex** 76:12,24 77:5, 6 80:6,8

**WEDNESDAY** 5:15

**week** 40:11 54:18 55:7

**weekend** 18:17 40:9, 10

**weeks** 40:7

**welcoming** 82:17

**West** 7:4

**Western** 44:24

**Whatsapp** 10:16,17 11:6 13:4,25 14:5,12, 16,18,22 15:3,5,6 16:9 17:19 18:5,10 24:4 48:23 49:5 50:13,22 64:16,18,21 69:23 71:2 72:16,18 73:16,25 74:22 75:10 85:16 86:25

**white** 65:13

**William** 7:9

**withdrawn** 67:25 86:23 87:3

**witness'** 80:13

**witness's** 8:21 9:1

**woman** 33:20 84:24

**words** 14:16 34:14

**work** 20:5,19 27:16 79:2,18 80:18,20 81:13, 14 82:11,15 83:3,18

**worked** 79:12

**working** 79:16,17,22 85:12

**world** 84:3,6

**worry** 9:3

**write** 34:7,8,17 46:19

**writes** 18:16 24:9 44:22

**writing** 82:21,23

**wrote** 24:7,15 26:2 31:22 32:5,7,20 33:5,19 35:19 36:3,17 38:21 39:10,15 40:9,22 41:17 42:12,14 43:2,6 44:3 45:5 47:2 55:2,6,10,21, 22 58:21 59:10,13,25 60:15 65:20

DAILYN HIDALGO HERNANDEZ                                          JOB NO. 2563037
APRIL 08, 2026

---

## Y

**year**  60:16 69:15

**years**  70:10,24 71:3
88:5,13

**yesterday**  60:1

**York**  4:17 5:2

**Yup**  27:5